Tate *vs.* The State of Georgia.

---

WESTLEY TATE, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. On the trial of an indictment for murder, where there is a general plea of not guilty, it is not error as against the prisoner for the Judge to charge the jury as to the law of justifiable homicide, even though, from the evidence, it is plain that the prisoner is in any event guilty of manslaughter. An error of the Court in his charge to the jury, which could not, in any view of it, have injured the prisoner under the evidence, is no ground for a new trial.

2. When the evidence showed that, without any considerable provocation, the prisoner "went at the deceased with an axe," and the deceased, standing in his place, picked up a heavy oak stick, and was stricken by the prisoner with the axe and killed as he was raising the stick, and the Judge charged the jury that if the deceased picked up the stick to defend himself, the prisoner was guilty of murder; but if the deceased picked it up for *mutual combat*, the prisoner was guilty only of manslaughter; and the jury found the defendant guilty of murder:
*Held,* That the charge was not one of which the prisoner could complain.

3. There need not be mutual blows to constitute a mutual combat. There must be a mutual intent to fight, and if this exists and but one blow be stricken, the mutual combat exists, even though the first blow kills or disables one of the parties. (R.)

Criminal law. Murder. Charge of Court. Immaterial error. Evidence. Before Judge ANDREWS. Elbert Superior Court. September Term, 1871.

Tate *vs.* The State of Georgia.

Westley Tate was placed upon trial for the murder of Jefferson Tate. The defendant pleaded not guilty.

The following evidence was introduced upon the trial :

### TESTIMONY FOR THE STATE.

MARION TATE, (colored) sworn : I think it was about sunset or between sunset and dark on Tuesday of last week; it was at the Ragland place in Elbert county ; on that day Westley Tate struck Jefferson Tate with a pole axe; he hit him on the right side of the head, near the top, more to the right than left. I think he hit him with the head of the axe; it appeared like a pretty heavy blow; knocked him down ; the wound was about an inch and a half wide and three and a half or four inches long; can't tell how deep it was; the skin was broken in one small place; was not able to get up; they took him up, spoke to him, called him and he did not answer. They carried him into the house and laid him down; he was knocked down on Tuesday and he lived until Thursday morning; he died in this county. I did not see the commencement of the difficulty between them two ; the fuss commenced about some "jowering" about some children; the women were West's wife, Muly and July, Jeff's uncle's wife ; West. was there before Jeff. came. When the killing took place Jeff. came up and set his basket down and goes in the house and gets a drink of water ; when he got the water he came out and walked to the wagon, where his basket was; he stood some few minutes leaning against the wagon, when he spoke to West. and said to him, "I don't think it right for you to curse another man's wife in her yard ;" don't remember what he had been saying before that; don't remember what West. was doing ; the women and defendant got in a great rage ; Jeff. spoke to defendant first; he told defendant that he did not think it was right for one man to be cursing and talking about killing another man's wife in her yard; West. asked him, "Did he take it up ?" Jeff. told him, "No! he didn't take it up in particular, more than he didn't think it was right;" West.

then told Jeff. "That he would hit his wife," and Jeff told him "I reckon not;" Jeff. said, "I think God give you more sense than to hit his wife if he were in some foreign country;" there was some few words passed between West. and Jeff. that I don't recollect. West. started to Jeff.; I never saw him; I heard him walking and talking back behind me; don't think that from the time until West. got half way there was another word spoke between them; I was sitting with my back to West. and face towards Jeff.; when I looked I saw Jeff. stoop after the double-tree, and as the double-tree was coming up I saw West.'s axe coming under the double-tree; he had raised the double-tree up when he struck; by the time he got the double-tree nearly straight West. struck Jeff. on the right side of his head with his axe; Jeff. and the double-tree all fell backwards and lodged on the hub of the wagon. At the time they commenced talking to each other I think they were fifteen or twenty steps apart, or more; don't think Jeff. moved out of his tracks; didn't examine to see whether the skull was broke or not. After West. knocked Jeff. down he walked off from there very quickly; Jeff. was standing at the fore-wheel of the wagon; the double-tree was separate from the wagon; he caught the double-tree up with both hands; it was a double-tree for a two-horse wagon, the usual size.

*Cross-examined:* I could kill a man with a weapon like that double-tree; I reckon the double-tree was nearly four feet long; it was lighter than a four-horse double-tree; the double-tree was lying on the ground, nothing attached to it; Jeff. was on the left side of the wagon; the tongue was towards the house; Jeff. was on the upper part of the wagon, on same side with witness, leaning against the fore-wheel; he was standing up between the front wheel and the tongue; there was no part of the wagon between witness and deceased; witness was on the same side of the wagon with deceased; deceased was leaning against the basket of cotton and the wagon; the basket was sitting on the wagon wheel; the deceased and wagon were three or four steps from the witness; I was sit-

Tate *vs.* The State of Georgia.

ting on a work-bench some five or six steps from the house ; don't know how long I had been there before the difficulty ; when I got there there was a difficulty between Muly and July ; heard them "jabbering" after I got there ; they were "jabbering" about Muly's baby and July's brother ; they had been quarreling ; don't know how long they had been quarreling before West. came up ; witness hadn't been there very long before West. came up ; they were quarreling about July's brother knocking down Muly's baby in play and hurting its face while they were playing ; Muly was in the family way ; she has had a baby since, so I have heard ; I heard she had a baby the next night from the chat. When West. came up he picked a chunk and started to knock her down with it for the fuss his wife and she was in ; he never knocked her down that I saw ; if he had have done it witness would have known it ; didn't see West. when he came up ; he came before Jeff. West. had been pulling fodder that day ; deceased, defendant and witness live on the same place ; witness and defendant live in the same inclosure ; Jeff. lives three hundred and fifty or four hundred yards on the other side of the branch ; the gin-house is on this side of the branch ; gin-house some four or five hundred yards from where difficulty took place ; West. was foreman on the place ; don't know what privileges he had ; I worked with my own squad ; Jeff. had a squad of his own ; Jeff.'s wife came with him and came by there ; it was on the way to the gin-house ; no quarrel had taken place between defendant and Jeff.'s wife ; I heard that West. brought an axe with him from the fodder field ; Jeff. said to West., after he came out of the house and lent up to the wagon wheel, " West., I don't think it is right to curse another man's wife in her yard, and talk about killing her ;" I know that West. did not speak to him first ; I think West. asked him, " Did he take it up ?" Jeff. told him, " No ! not particular, but he didn't think it right ;" West. told him, I think, " He would hit his wife ;" Jeff. laughed, and said, " No ! I think God gave you better sense than that ; I don't think you would strike my wife if I was

in some fur country ;" don't know why West. said he would strike his wife; nothing had passed between West. and Jeff.'s wife.    When he was struck with the axe he fell back and lodged against the hub, on the outside of the wheel on the left, and the double-tree fell on the left of him ; defendant and deceased were about the same size ; witness recognizes prisoner as the one that struck deceased with the axe ; July lived in the same inclosure and same yard ; I saw nobody but Jeff.

JIM MARTIN, (colored) sworn : Was present at a difficulty between Jeff. Tate and West. Tate, at Mr. Tate's "Ragland place," in Elbert county, on Tuesday evening of last week ; as we came up from the fodder field some women were quarreling about some children ; West. came and heard them quarreling and took it up ; West. Tate's wife, Muly Tate, and July Tate were the women that were quarreling ; West commenced cursing Aunt July in her yard, and Jeff. spoke and told West that "He didn't think that he was doing right to curse a woman in her yard ;" Jeff. told him that "He didn't think that he would like for any man to go in his yard and curse his wife that way ;" West. spoke and told him that he "would curse his wife or any other God damned man's wife that was standing on his toes ;" Jeff. told him, "I reckon not, West.; I might go to some fur country or other and God gave you better sense than to hit my wife ;" West. said, "God damn you, I'll show you, you God damned yellow rascal ;" then he made to him with the axe ; Jeff. stooped down to get the double-tree and before Jeff. got exactly straight with it West. hit him on the right side of the head with the axe ; he knocked him down ; he first fell on the wagon hub and lay there a few minutes and then fell on the ground ; he knocked him down with a pole axe; he hit him with the butt of the axe; he hit him on his head, on the right side of his head near the top of his head ; witness recognizes prisoner as the one that struck deceased with the axe.    After West. knocked Jeff. down he threw down his axe and walked a short distance, then struck a little trot;

Tate *vs.* The State of Georgia.

I saw no more of him until I saw him in jail. After Jeff. fell on the ground we picked him up and carried him in Oliver Tate's house; he lived until Thursday morning after he was knocked down; I was with Jeff. nearly all the time after he was struck until he died; he did not talk any; he was speechless; never heard him speak from the time he was knocked down until he died; I looked at the wound; it broke the skull; did not notice how long the wound was; it was about three inches long and about an inch wide, I think; don't know how much the axe was worth; more than twenty-five cents.

*Cross-examined:* I work on Mr. Tate's place with prisoner's squad; deceased worked in separate squad; worked in same field that day but not together; West. was stacking fodder and Jeff. was picking cotton; West. went from the fodder field that night home; witness and prisoner went together from the fodder field to the yard where the killing took place, and found Muly and July quarreling; nobody there but Muly and July that I saw; nobody with me but West.; West. carried an axe with him from the field that he had been using; the axe with which he killed Jeff.; we had been there about ten minutes when Jeff. came up; the quarrel continued between the two women and was going on when Jeff. came up; the women were quarreling about West.'s wife's little boy; the children had not been fighting; I heard them say that July's brother run against Muly's little boy and knocked him down; July's brother was about as high as the middle of witness' breast; Muly's child was about three years old, the one that was knocked down; the women talked angrily; Muly, West's wife, was in the family way, and had a child the next night, I think; July is a large size woman, twenty-five or six years old; Muly is a right smart smaller than July. West. struck under the double-tree with the axe; the whole width of the head of the axe struck into his skull far enough to break it; he struck very near the crown of the head; it was the double-tree of a two-horse wagon, usual size; could kill a man with it by striking pretty hard; Jeff.

brought his basket of cotton and set it on the wagon; he was going to the gin-house with it; that was the way to the gin-house; not related to any of the parties; deceased died in Elbert county. West. was standing twenty-six steps from Jeff. when they were quarreling; I was standing by West; I don't know the distance from where I was standing with prisoner to deceased; West. was as far from Jeff. as from the place where witness is standing to Tate's store; don't know that the distance was measured; Jeff. stood in the same place all the time; the women were quarreling in Oliver Tate's yard; it was three or four hundred yards from Oliver Tate's house to West's house; Jeff. never moved out of his tracks; West. moved all the way from where he was standing to where Jeff. was; he walked and talked pretty fast when he went up to where Jeff. was. West. came on from the fodder field by home and on to Oliver's house; he never stopped at home.

JABOB BURTON, sworn: I assisted in arresting the prisoner; we arrested him last Friday night, in South Carolina, at Mr. McCalla's quarters; had no warrant for his arrest; he made no resistance; there were nine of us, two with Mr. Blackwell and Colbert.

The defendant introduced no evidence. Admitted that Jefferson Tate is dead, and that he died from the wound inflicted by defendant.

The jury found the defendant guilty of murder.

The defendant moved for a new trial upon the following grounds, to-wit:

1st. Because the Court erred in charging the jury, " that provocation by threats will not be sufficient to reduce the crime from murder to manslaughter, when the person killed is unarmed and neither making or attempting any violence upon the prisoner at the time of the killing, provided nothing was said or done to excite that irresistible passion before commented on."

2d. Because the Court erred in charging the jury, "that

Tate *vs.* The State of Georgia.

that which is perfectly justifiable on the part of the deceased cannot be any legal provocation to the slayer."

3d. Because the Court erred in giving in charge to the jury sections 4265 and 4267 of Irwin's Revised Code, as the defense set up in the case was that the killing was voluntary manslaughter.

4th. Because the Court erred in charging the jury, "that if they believed from the testimony that the prisoner was advancing on the deceased with a declaration, God damn you, I'll show you, you God damned yellow rascal, and with an axe, that the deceased was justifiable in taking up a double-tree of a two-horse wagon to defend himself from the attack, and if in so doing was killed by the prisoner by a blow on the head with an axe by the prisoner, this using of the double-tree does not free the prisoner from the crime of murder; that it depended on the spirit with which the double-tree was seized whether for mutual combat or self-defense."

5th. Because the Court erred in giving in charge to the jury, "that provocation by threats will not be sufficient to reduce the crime from murder to manslaughter, when the person killed is unarmed and neither making nor attempting any violence upon the prisoner at the time of the killing."

6th. Because the Court erred in refusing to charge the jury as requested: "That if the jury believed from the evidence in the case, that the prisoner and the deceased, upon a sudden quarrel, both seized weapons likely to produce death, and the prisoner killed deceased, then the killing was voluntary manslaughter and not murder; and it is immaterial who struck the first blow;" and in charging the jury as follows: "It depends upon the circumstances under which the weapons were seized; if for mutual combat, it matters not who struck the first blow; but if the jury believed that Jeff. seized the double-tree standing in self-defense, and for that purpose, it would not reduce the homicide to the grade of manslaughter; and the cases read by defendant's counsel to sustain this request are those of mutual combat; so the Court charges you, if you believe Jeff. seized the double-tree for self-defense, it would

not reduce the offense to manslaughter; but if you believe he seized it for mutual combat the offense is reduced to that crime only. And in all cases of mutual combat the mutual intent to fight must be a mutual purpose in the parties simultaneously, and to constitute a case of such combat mutual blows must pass between the parties."

7th. Because the Court erred in refusing to charge the jury as requested as follows: "If the jury believes from the evidence in the case, that the prisoner and deceased were engaged in a mutual quarrel, and prisoner seized an axe but did *not strike* until the deceased had seized a double-tree, a weapon likely to produce death, and had put it into a striking position and the prisoner then struck him, then the killing was voluntary manslaughter, and not murder;" and in repeating his charge to the jury as set forth in the sixth ground of complaint.

8th. Because the verdict was contrary to law and to evidence.

The motion for a new trial was overruled by the Court, and defendant excepted, and now assigns said ruling as error.

J. D. MATHEWS; EDWARDS & SHANNON, for plaintiff in error. 1st. The first and fifth charges to the jury are upon assumed state of facts: 11 Ga. R., 286; 14 *Ib.,* 137; 30 *Ib.,* 271, 714. 2d. The second charge was an intimation of opinion upon the evidence: Code, sec. 3183; 14 *Ib.,* 137. 3d. The third charge excluded manslaughter from the consideration of the jury: 20 Ga. R., 594. 4th. Error to refuse requests to charge as to mutual combat: Code, sec. 3664; 1 Russ. on Crimes, 584; 15 Ga. R., 223. 5th. Evidence shows no malice: Code, sec. 4254; 3 Ga. R., 324; 1 Russ. on Crimes, 482; Ros. Crim. Ev., 684; 30 Ga. R., 67; 15 *Ib.,* 223; 25 *Ib.,* 527; 42 *Ib.,* 609. 6th. Homicide to prevent assault and battery is voluntary manslaughter: 18 Ga. R., 194; 24 *Ib.,* 282.

SAMUEL LUMPKIN, Solicitor General; ROBERT HESTER, for the State. 1st and 5th. The charge complained of is

Tate *vs.* The State of Georgia.

law: 25 Ga. R., 207; Reese's Hom., 31. Misdirection upon abstract principle of law immaterial: 31 Ga. R., 426; 17 *Ib.*, 194; 22 *Ib.*, 237; 28 *Ib.*, 215; 41 *Ib.*, 485. 2d. The second charge is good law: 29 Ga. R., 470; 34 *Ib.*, 85. 3d. The third charge is more favorable to plaintiff in error: 41 Ga. R., 485. 4th. This is not a case of mutual combat.

McCAY, Judge.

This was an indictment for murder, and there was a plea of not guilty generally. Under the proof, we think it was no error in the Court to charge the law of justifiable homicide. The record shows a general denial of guilt, and it was not improper that the Judge should inform the jury under what circumstances one may lawfully kill another, and it would be a strong case of hypercriticism to say, that a new trial ought to be granted if the Judge allude to instances of justification wholly unlike the case on trial. It is common for the Court to read the definition of justifiable homicide, "the taking a human life by *commandment* of law, or by *permission* of law, or in self-defense;" surely it is not error in the Court to do this, even though the case is one one of self-defense alone. That the Judge in *this* case charged the jury in reference to the law of justifiable homicide, etc., was no harm to the prisoner. In the first place, his plea was "not guilty;" the proof was very plain that the deceased was killed by him, and he was "guilty" unless justified. In the next place, we have no evidence from the record, that his counsel waived his plea of not guilty, and stood only on the denial of the guilt of murder; as the record stands the denial was of any guilt. We are not prepared to say, that even if the record showed that the counsel had, in the argument, admitted guilt of manslaughter, that the charge of the Judge as to justifiable manslaughter would have been ground for new trial. At best the charge may in that event have been unnecessary. But we are not clear it could even then be said to have injured the defendant. We think the Judge

was in error in saying there must be mutual blows to constitute a mutual combat. There must be a mutual intent to fight. But we think if this exists, and but one blow be stricken, that the mutual combat exists, even though the first blow kills or disables one of the parties. Were there *any evidence* here of a mutual combat we should be constrained to reverse the judgment. But we are clear that there was before the jury nothing to authorize any doubt even upon their minds that this was not a mutual combat. The deceased showed no sign of a disposition to fight. He denied taking up the quarrel of the woman. He stood at his place; he had, or showed no arms. Indeed, he seems to have been very slow even in getting ready to defend himself, since the defendant had about twenty steps to go, and got to him and struck him before he got the double-tree picked up, and in a position even to defend himself. Had *he* got the first blow and that blow proved fatal, the killing would by him have clearly been justifiable. He sees a man coming at him with an axe, cursing him, threatening to show him what he could, and would do, and his picking up the double-tree and raising it was nothing but the promptings of that universal feeling of self-defense implanted in all animal nature.

The conviction is right; it was not justified only, but demanded by the testimony. The jury were bound, on their oaths, to find as they did, and we do not feel it to be our duty to grant a new trial, because the Judge gave the law wrongly, upon a state of facts which did not exist. This offense was murder. There was no considerable provocation—nothing to bring it to the grade of manslaughter.

Judgment affirmed.