## McNAUGHTON v. THE STATE.

1-3. The charge of the court was not subject to the criticisms made upon it.

4. When in a criminal case, after verdict, an attack is made upon a juror upon the ground that he was not impartial, the trial judge occupied the place of a trior, and his finding that the juror is competent will not be reversed, unless under all the facts the discretion of the judge is manifestly abused. No abuse of discretion appears in this case.

5, 6. The grounds of the motion for new trial complaining of the omission to charge and refusal of the court to charge as requested were without merit.

7. The evidence was sufficient to support the verdict. (Atkinson, J., dissents from this ruling.)

JULY 13, 1911.

REHEARING DENIED AUGUST 15, 1911.

Indictment for murder. Before Judge Gilbert. Emanuel superior court. January 27, 1911.

Dr. W. J. McNaughton and Mrs. Mattie Flanders were jointly indicted for the murder of Fred Flanders, the husband of the last-named defendant. The indictment contained five counts, in the first, fourth, and fifth of which it was alleged that the homicide resulted from arsenic poisoning, arsenious oxide poisoning, and other poisons of like deadly character, the names of which were to the grand jurors unknown, administered directly by the defendants in different ways; and in the second and third, by causing the same kinds of poisons to be administered by other named persons. Mc-Naughton was placed on separate trial, and the jury trying the case returned a verdict of guilty, without recommendation. A motion for new trial was made and overruled, and error was assigned upon the judgment. The testimony submitted, and the prisoner's statement on the trial, were in substance as follows:

Fred Flanders died June 4th, 1910, after illness continuing from the 18th or 19th of the preceding month, during which Dr. McNaughton attended him as physician. The body was exhumed on the second day after burial, and the stomach taken out by physicians, sealed in a jar, and sent to an analytical chemist, who discovered in it 22.6 milligrams of arsenic—"about one third or one fourth of a grain." At the instance of the accused or his counsel, the body was again exhumed, and the liver, heart, and kidneys taken out and examined by the same chemist; and arsenic was found in each of these organs. The total quantity found in stomach, liver, heart, and kidneys was 56 milligrams, "practically seven eighths of a grain." Dr. Everhart, the chemist, testified that arsenic could not have gotten into these organs without having been administered; that he found in the stomach indications leading him to believe it had been administered as arsenic powder, or arsenic acid, "that is, a white powder;" that although the appearance of the stomach may have been caused by other things, it was indicative of arsenic poisoning; he counted four little effusions on the lining of the stomach, looking very much like little pimples, and arsenic produces that effect. Arsenic goes through the nervous system and burns the tissues. That which was found in the stomach seemed to have come through the mouth. In the opinion of the witness the arsenic was administered before death. If administered to a dead body it would not, in his opinion, have produced the effusions or spots found in the stomach. It is active on living flesh and inactive on dead flesh; on a dead body it is more or less inert. In his opinion, judging from the amount obtained, enough arsenic had been given to Flanders to produce his death. Two physicians (Doctors Houston and Smith, the only other experts examined on the subject) concurred with him in the opinion that the presence of seven eighths of a grain indicated that a larger quantity had been introduced into the system; arsenic is carried by the blood into all parts of the body, and is found in the brain, the bones, the marrow, and even in the finger nails; and the full quantity taken into the system is not found after death, for the body throws off the poison as fast as it can; it is eliminated through the kidneys and by the liver, and passes out through the bowels and in the urine, and may be thrown out by vomiting. It manifests itself first usually in vomiting. Vomiting is a revulsion of nature

against this irritant, to try to throw it off, and the same kind of revulsion takes place in the bowels, where there is an effort to rid the system of it by purging. In some cases of deaths from arsenic poison no arsenic was found; in some cases as little as one tenth of a grain; sometimes as much as four or five grains, chiefly in the stomach. "Seven eighths of a grain must represent the administration of a very much larger dose of arsenic than is used in medicine." The small traces found in certain substances referred to by the authorities, such as sulphate of soda, salts, phosphate of soda, and in the impurities in various chemicals and drugs, would not lead to the finding of as much as seven eighths of a grain of arsenic in the body. A medicinal dose of arsenic is about one thirtieth of a grain. The smallest quantity recognized as possibly fatal is about two grains; authorities differ as to whether two grains might be fatal. Dr. Everhart testified: "They usually suppose that three grains is a fatal dose." Dr. Houston testified that the statement that "probably ten grains would be likely fatal to most persons, unless prompt and efficient treatment was had," seemed reasonable, though a medical writer had stated that on a search through reported cases no evidence was found as to a smaller fatal dose than thirty grains. Some men are more susceptible to the effects of the poison than are others. There are reported cases of "arsenic fiends" who gradually increase doses until they can take enough to kill several men, but reliable authorities deny that such cases exist.

It was testified that a majority of the deaths from one dose occur within twenty-four hours; some much sooner; but small doses in excess of a proper dose might be administered from day to day, with the result that the poison would accumulate in the system more rapidly than it could be thrown off, tissue would be destroyed, and kidneys, heart, nervous system, etc., be damaged so that they would be unable to recuperate; and in such cases death might be produced "in a few weeks, or in a week or two." One of the physicians testified that if a quarter of a grain were given at one time, the last of it would probably be gone from the body in about two weeks; but that if that quantity were given daily it would accumulate faster than it could be thrown off. Another testified that if doses sufficient to make one sick, but not to kill—say one tenth or one fifth of a grain—were given from day to day, the effect would

become cumulative, though the quantity would not. Fatty degeneration of the organs is one of the means by which arsenic produces death; and in this case the chemist found a considerable quantity of fat which had to be filtered. The fatty degeneration, he testified, might be produced by other causes than arsenic. Arsenic in powdered form may be given in water or other liquid; it is soluble, practically tasteless, and has no odor. In a certificate given by the accused as attending physician, dated June 22, 1910, his answer to a question as to the disease of which Fred Flanders died, its origin, history, and symptoms, was as follows: "A complication of liver, kidney, and stomach; about May 19, when I was first consulted, headache, enlargement of the right side; pain in the right shoulder and spine; retention of urine, vomiting, nephritis acute; also mind impaired from urethea." Testimony as to his symptoms during the illness was given by two of his brothers and other witnesses, who visited him, none of whom saw him later than six days before his death. So far as appears from the testimony and from the statement of the accused, the only physician present at any time during the illness, other than the accused, was Dr. Bell, an uncle of the sick man's wife. He died before the trial. It does not appear that he called more than once, or ever gave Flanders any medicine. From the testimony it appears that the sick man had frequent pains and a burning sensation in the stomach and "up in his breast," nausea, and headaches, often vomited, complained that he was nearly blind, and complained that his kidneys and liver were giving him trouble. His face was very red, and he had a number of pimples on his face and his arms; he had red spots on the forehead. His complexion was naturally red. He had frequent evacuations from the bowels. The first time his brother, Jordan Flanders, saw him during his illness was on Sunday, May 21st. He vomited continually while the witness was there, complained of burning sensations in his stomach, and that he had nearly died the night before, that his heart exhausted like a steam-engine under a heavy load; he complained of blindness, a good number of pimples had broken out on his face and arms. Dr. McNaughton and the sick man's wife were there. The vomiting seemed to bring up nothing but water, a green solution. The doctor or the wife gave him some medicine that day. According to the recollection of the witness, it was a liquid medicine, which was on the bureau in the

sick-room. The witness left Sunday evening, and returned on Wednesday, the 24th. The sick man was in bed, but sat up. He seemed better. He was not so sick in the stomach, but if he took water or anything else he vomited. The witness did not see Dr. McNaughton give him medicine that day. The witness went back to see him on Saturday, the 27th, found him very sick, worse than he had seen him before, and with like symptoms. The witness did not think that McNaughton gave him any medicine that day until night. About night McNaughton came in with a little jar, or jar-shaped bottle, like a snuff-jar, containing a white-looking powder, which he had got from his apothecary shop in the same house, and said that he wanted Fred to have a teaspoonful of it about every three or four hours during the night. The witness stayed there all night and until the next evening, when the sick man seemed a little better. In the morning Dr. McNaughton came in and gave him a dose of liquid medicine, through the mouth. The witness went back Monday evening or night. Fred was very sick then. His complaints were the same. He claimed to have no fever. McNaughton was there, and said he had no fever. The witness stayed until two hours by sun the next morning. He did not again see his brother alive. One time he saw Dr. McNaughton give Fred an enema, the white of an egg with white looking powders in it. The doctor said that Fred's stomach would not retain anything, and he had to have something to strengthen him. The last night that the witness was there no medicine was given, and Fred was much better the next morning. "Repeatedly he would say, 'The medicine I take makes me worse,' and they would make the remark, 'The medicine is all right, Fred. You will have to take your medicine,' and he would take it, and in a few minutes he would go to throwing up." The night the witness gave him medicine he threw up about every ten minutes during the night; the witness gave him the medicine according to directions, every three or four hours. It looked like a white powder, and whenever it was put in a glass of water it would boil up. He could not say whether the doctor gave any tablets or capsules or anything of that sort. He could not tell what the white medicine was. The doctor's prescription on the bottle nearly covered the other label, which looked as if it was the manufacturer's. He did not notice if there was anything on the other side of the bottle. Fred's bowels moved many times

while the witness was there. Dr. McNaughton said he was giving the white medicine to him for his kidneys. On Monday night, the last night the witness stayed with him, another brother was with them, and they did not give him any medicine; the next morning Fred seemed much better, and the doctor said, "I have got more hopes of Fred this morning than I have had at all." The preceding Saturday night the witness gave three doses as directed. Fred complained that it made him worse, and after two o'clock he gave him no more. He was sick through the night and up [to] the next day; he seemed better after dinner. Repeatedly when the witness asked McNaughton what was the matter with his brother, the reply was "a complication of troubles." Finally, after being pressed further, he said, "Kidney and liver."

John Allen Flanders, one of the brothers of the deceased, testified, that the night he was there, Fred vomited and heaved during the first part of the night, and the doctor told him that he had decided not to give any medicine that night, to let his stomach rest. He seemed a great deal better the next morning. Fred frequently called for water, and said he was burning up in his stomach; the witness gave him water every few minutes. The doctor gave some medicine the next morning.

R. A. Wood testified, that he was present when Dr. Bell called to see Fred Flanders. Dr. Bell asked what was the trouble, and where did he hurt. Fred said he had no pain, and that he did not seem to be suffering except with sick stomach. He vomited frequently. He told Dr. Bell his kidneys had been out of the ordinary, but had got where they acted again, and that his liver seemed to be giving him a little trouble. Dr. Bell did not give him any medicine. Dr. Bell asked Dr. McNaughton whether he had given Fred a certain medicine, and was told that it had been given; and he advised that a blister be put on the pit of the stomach to stop the vomiting. He told Fred that Fred's kidneys and liver seemed to be a little out of order, but he saw no reason why Fred should not be up in two or three days attending to his business.

J. N. Kitchens testified, that Fred Flanders ate supper at his house on Tuesday night, May 17, and then seemed to be in good health. On the following Thursday he found Fred in bed. Mr. Thompson wanted to know about his ability to swap horses. Fred said he didn't know that he felt like it, and Dr. McNaughton said,

"No, he is not able; he has just taken a dose of medicine, and he will be mighty sick." He did not vomit while the witness was there.

According to the testimony of the physicians, the symptoms described by the witnesses were usual in cases of arsenic poisoning. Dr. Smith testified that if a man is taken sick and has violent vomiting spells, especially after medicine in the form of a white powder is given to him, and he suffers from about the 17th of May until the 4th of June before he dies, and if spots appear on his face, and he has pains in the stomach and in the region of the esophagus, and he gets better and worse at times until he dies; and if he has also partial blindness or his sight is clouded to some extent, and after his death seven eighths of a grain of arsenic is found in the organs—the heart, the liver, the kidneys and the stomach, and there is also found fatty degeneration of the liver, and four red spots are found in the stomach, the deceased not having had fever, so far as known, he (witness) would say that the death was from arsenic poisoning. According to the testimony of this witness and of Dr. Houston, however, the symptoms stated, or some of them, are similar to those of uremic poisoning or acute nephritis. It was also stated that the vomiting could have been caused by calomel or other medicines. Dr. Smith stated that, notwithstanding these symptoms, the deceased might have died from something else than arsenic poisoning, but, taking them in connection with the finding of the arsenic in the stomach, he did not think so.

The undertaker who prepared the body for burial testified that he used embalming fluid on the face, giving the face a massage, but that none of the fluid was introduced into the body, and that there was no arsenic in the fluid. The formula of the fluid, as furnished by the manufacturer, gave, as the ingredients, formaldehyde, carbolic acid, alcohol, and water. The witness stated that the lips were closed and he did not open them. A cloth and cotton with the fluid on it were kept on the face. On cross examination he stated that he did not think he put any cotton up the nose of the deceased; he did not know whether he dampened cotton with the embalming fluid and put it up the nose or not, and did not think that he packed cotton inside the mouth; he used absorbent cotton, which would take up a good deal of the fluid; about a quart

of the fluid was used by him and others. Another witness testified that he was present when the undertaker used cotton on the face of the deceased; he was there about two hours, and when the undertaker left, the mouth was closed, and the undertaker did not rest the cotton on the top of the mouth or the face so that the liquid could soak in, and did not put it on the nose.

Dr. McNaughton, in his statement to the jury, said he found that the formula of the embalming fluid used by the undertaker contained 10 per cent. of arsenate of soda, a substance composed of powdered arsenic and soda; and that the undertaker put cotton, saturated with this fluid, into the mouth and nostrils of the deceased. Dr. Houston testified that where arsenic in an embalming fluid is introduced into the stomach after death, the bulk of it will remain there, the blood in a dead body being very sluggish and coagulating soon after death; that small quantities might be diffused through the walls of the stomach, but the relative proportions which the chemist testified were found in the stomach and in the heart, lungs, etc., "would speak most certainly against the possible idea that the poison was introduced in the form of an embalming fluid into the stomach and had diffused in that way." If cotton or a cloth were saturated with the embalming fluid and placed on a dead man's face or over his open mouth, it might very rapidly get into the stomach. On analysis one would not find as much of it in the liver and in the heart and the kidneys as in the stomach. If a cloth were placed over the face and none of the fluid got into the mouth, it would probably take weeks for it to penetrate through the body.

At the time of his death and for more than a year Flanders and his wife were residing in McNaughton's house, and McNaughton boarded with them and had his office there. No one else lived with them. McNaughton was a widower. It appears that there was undue intimacy between McNaughton and the wife, but, so far as appears, the relations between the two men and between husband and wife were entirely harmonious. When taken ill Flanders was preparing to move away with his wife and go into the sawmill business in Thomas county, and had packed his household goods and loaded them on wagons, with the intention of going through the country with them, but on account of his illness he sent them off under the charge of another person, retaining only trunks and

clothes. Several times during the illness McNaughton told others that Flanders was very sick and that it was doubtful whether he would get well. He said this to Flanders' brother Jordan, and Jordan repeatedly proposed to the doctor and the wife that an additional physician be procured. Once McNaughton replied, "You can have a hundred doctors here if you want it; I know what is the matter with him, and I know what to do for him;" and the wife said there was no use in having doctors there and piling up costs on them for nothing. Later it was proposed by the brother that Dr. Smith, of Swainsboro, be consulted; McNaughton promised to get Dr. Smith, but did not comply with the promise. In his statement to the jury McNaughton said that when he went to do so Mrs. Flanders objected; she said it was unnecessary; and this was the reason he did not call Dr. Smith. The brother proposed to take the sick man to his own home, but the doctor and the wife objected, saying it would not do to move him. During the illness the wife and the doctor spent much of the time out of the sick-room and in private conversation in other parts of the house. One of the brothers testified: "When they were together she looked to me like a woman that thought more of him than I ever saw a woman thought of a man; I never saw a man's wife pay more attention to him than she did to McNaughton." Others testified to having seen them kissing, etc., before the illness. It was testified that at the funeral "she did not act like a woman that cared; . . she made some alarm, but it looked as though it were forced;" and on the following morning she went in a buggy with McNaughton to the office of the ordinary of the county, in regard to the administration of the husband's estate, and was cheerful and laughing. The value of the estate was several thousand dollars in addition to life-insurance amounting to $3,000, of which she was sole beneficiary, and which had been procured in the preceding March, on a certificate of McNaughton as to the good health of the insured. Mrs. Durden testified that on the day following the burial McNaughton and the widow came to her and wanted her to take charge of his house and board them, but she declined to do so. McNaughton went to Thomas county and assisted in disposing of the property there for the widow. Afterwards he went to Augusta, and while there he was arrested at the home of his brother, upon the charge of having murdered Flanders. In his statement to the

jury he said that threats contained in an anonymous letter, and rumors of an intention to lynch him, caused him to go to see his brother in Augusta; he had no one in the county to discuss the sit- uation with; he expected to return to the county and demand an: investigation; and while in Augusta he rode on the streets with others. Mrs. Flanders remained at his house after the funeral, with her father and sister, until she went with them on their return to Bartow county. The accused denied that there was anything improper in his relations with Mrs. Flanders. He further stated to the jury that about May 18th or 19th, 1910, Flanders called on him for treatment. Before that time Flanders had worked hard and often overtaxed his strength, and would come home wet to his knees, tired and worn out, and he worried about his business. When feeling bad he would undertake to physic himself, taking salts occasionally, and occasionally he would see a patent medicine recommended, and he would think that he had the symptoms it was recommended for, and he would buy it and take it. When he called on McNaughton for treatment at the time mentioned, he told Mc-Naughton that he had taken epsom salts almost every night for two weeks, and said he had been having sudden, intense headaches; which would after a while wear off; that he had a bad spell about three weeks before, while in Thomasville, and took a remedy which seemed to relieve him, but he did not tell what it was. He com-plained of his right side, right shoulder, and spine, and his mind seemed bad; his tongue was heavily coated: he was constipated, his kidneys not acting; his temperature was 98. The statement of the accused continued as follows: "I then gave calomel, 10 grains, 'pto filin' [podophyllin?] two thirds of a grain, and sodium 10 grains. Not being able to move his bowels with medicine, I gave him an enema of soap and water. . . After this I was able to keep the bowels fairly open with sal hepatica and sal laxative. The medicine that Mr. Jordan spoke of was sal laxative. At what I thought to be the proper time I gave him another dose of calomel; . . it was prepared in Dublin. . . I then prescribed fringe tree alternative [alterative?], a medicine prepared by Nelson, Baker & Company, of Detroit, Michigan. After then Dr. Bell was called in, in consultation. He made an examination and diagnosed the case and agreed with me that he was suffering with or from uremia or uremic poison. He not only examined Mr. Flanders,

but questioned him closely as to his condition.  After then I went over my treatment, and he said I was doing all that could be done, and that I was giving him the correct medicine. . . I did not give Mr. Flanders any arsenic, because I didn't think that he needed it, and if he obtained any from the medicine that I gave him, it was because of that ingredient in the medicine and not being chemically pure contained arsenic.  I find that plaster of paris with which these jars were sealed [the jars in which the stomach and other organs were placed were sealed with plaster of paris around the glass stopper] contained arsenic in appreciable quantities.  I find that sodium phosphate, according to the United States Dispensatory, . . in commerce, contains arsenic in dangerous quantities.  I gave him laxatives to keep his bowels open.  One of the ingredients in such laxatives is sodium phosphate, 24 grains. I also gave him fringe tree alternative [alterative?], prepared by Messrs. Nelson, Baker & Company, and highly recommended in cases of stomach and liver trouble.  I find that it contains sodium phosphate.  I also find in Wilcox on Materia Medica and Pharmacy . . . that calomel contains what is known as impurities of calomel, and denominated as chloride of mercury and arsenic.  As I do not deal directly with the manufacturers of calomel, it may be that some of these medicines were not chemically pure, and therefore contained arsenic in appreciable quantities.  I did not know this, but I do know that each medicine given was highly recommended for the symptoms that Mr. Flanders had.  As a part of the treatment as suggested by Dr. Bell, I applied poultices and counter-irritants to Mr. Flanders' stomach, hoping thereby to allay the vomiting; and on Friday morning before Mr. Flanders died about 2:45 Saturday morning, he asked his wife for some milk, and she gave him some milk and bread.  He drank part of the milk and ate a little of the bread; and when I left to attend a call, it had remained on his stomach without his having vomited it up.  This was the last thing in the shape of food or medicine that Mr. Flanders took, except when I went in to him and found he was very weak, and found that possibly his heart had gone back on him.  I used certain restoratives as I could to bridge over the threatened end."

Dr. Everhart testified that sodium phosphate as used in medicine is not the commercial kind, or raw material, referred to in the dispensatory from which the accused read in his statement to the

jury, but is refined, and arsenic is not a part of it, and would not get in it except by accident or from the use of impure materials in manufacture: he had never seen or heard of any that had arsenic in it.

The motion for new trial contained the general grounds; and others complaining of the charge of the court to the jury and refusal to charge; and another setting up incompetency of certain jurors, brought to the attention of the court after verdict, all of which sufficiently appear in the opinion.

*A. L. Franklin* and *Saffold & Larsen*, for plaintiff in error.

*H. A. Hall, attorney-general, Alfred Herrington, solicitor-general, Hines & Jordan,* and *R. R. Arnold,* contra.

ATKINSON, J. 1. The fourth ground of the amended motion for new trial complained of the charge of the court, "as follows: 'To warrant a conviction upon circumstantial evidence the proven facts must not only be consistent with the hypothesis of guilt, but must exclude every other reasonable hypothesis save that of the guilt of the accused. If both theories, that is the theory of guilt and the theory of innocence, are consistent with the proven facts, then you should give the benefit of the doubt to the defendant and acquit him,' thereby laying down, movant contends, as a final test of when a conviction could be had under circumstantial evidence, the test that if both theories are of equal consistency, then and only then should the jury give the benefit of the doubt to the defendant, and thereby taking away from the jury the correct law of circumstantial evidence as above charged in the first part of the charge of the court quoted; and this statement as to the two theories is not the law in a case like the one at bar, where the conviction depended entirely upon circumstantial evidence, the law of circumstantial evidence going one step further than the doctrine of reasonable doubt, to wit: The theory of guilt must not only be consistent, but the evidence must exclude every other reasonable hypothesis, the law being that the evidence could be perfectly consistent with guilt and the jury would not be authorized to convict unless the evidence went further and excluded every other reasonable hypothesis; and said charge is error further, because, in order for the defendant to be acquitted under circumstantial testimony, it is not necessary that the evidence be consistent with the theory of innocence in order for the defendant to be acquitted, or to receive the

benefit of the doctrine of reasonable doubt, the law being that the burden is on the State to establish the guilt of the defendant to the exclusion of every other reasonable hypothesis, and whether or not the circumstances proven are consistent with the innocence of the party makes no difference, if said circumstances are not to the exclusion of every other reasonable hypothesis, the defendant could not be convicted, no matter how consistent the evidence might be, or how inconsistent it might be with the theory of innocence; said charge is further error for the reason that it lays down the rule that the evidence required to acquit, and before a defendant should have the benefit of the reasonable doubt, must establish a theory consistent with the defendant's innocence, the true theory being that the evidence must establish a theory consistent with the defendant's guilt and to the exclusion of every other reasonable hypothesis, and it makes no difference whether or not the theory of innocence is established by the evidence as consistent as the theory of guilt, if the evidence fails to exclude every other reasonable hypothesis, save that of the guilt of the accused; and said charge is error because it qualifies the law of circumstantial evidence." The first part of the charge excepted to is a literal reproduction of section 984 of the Penal Code. The remainder of the charge excepted to was not subject to the criticisms made upon it.

2. The fifth ground of the amended motion for new trial complained of the charge, "as follows: 'Mathematical certainty is not required and can not be attained in a legal investigation; moral and reasonable certainty is all that the law requires. Whenever you are convinced beyond a reasonable doubt, or to a moral and reasonable certainty, that this defendant is guilty, you would be authorized to so find. In the absence of such a degree of conviction on your part, you would not be authorized to find him guilty, but should return a verdict of not guilty, which would fully acquit and discharge him.' The error in said charge, movant contends, being that it does not give the law of this case, this case depending entirely on circumstantial evidence, the court saying whenever you are convinced beyond a reasonable doubt, or to a moral and reasonable certainty, that this defendant is guilty, you would be authorized to so find, when the law of this case is not dependent upon the doctrine of reasonable doubt, but is dependent upon the law of circumstantial evidence, and the charge places this case on the doc-

trine of reasonable doubt, and is therefore error; the charge should have gone one step further and said that in this case, before they would be authorized to convict, that the evidence should exclude every other reasonable hypothesis save the guilt of the accused, this charge of the court placing the conviction or acquittal upon the doctrine of reasonable doubt, which does not apply to cases where the conviction is dependent solely upon circumstantial evidence. This is especial error because the court having nowhere charged the law of circumstantial evidence." The charge excepted to applies the principles of sections 1012-1013 of the Penal Code, which were codified from the decision rendered in the case of *John* v. *State*, 33 *Ga.* 258, that being a case dependent upon purely circumstantial evidence. Section 1012 of the Code declares: "Moral and reasonable certainty is all that can be expected in legal investigation;" while § 1013 declares: "Whether dependent upon positive or circumstantial evidence, the true question in criminal cases is, not whether it be possible that the conclusion at which the testimony points may be false, but whether there is sufficient testimony to satisfy the mind and conscience beyond a reasonable doubt." In view of the law as thus stated, it does not affect the ruling in the case that all the evidence relied upon for a conviction was circumstantial. In *Giles* v. *State*, 6 *Ga.* 276, it was said: "On the trial of criminal cases, moral, and not mathematical or metaphysical certainty, is all that the law requires, or that is attainable. The doubts of a jury, to justify an acquittal, should be reasonable, and not a mere vague conjecture or possibility of the innocence of the accused." Also: "Direct and irrefragable evidence can not and need not be always produced in criminal cases; all that is necessary is, that the jury, whether the proof be positive or presumptive, be satisfied of the defendant's guilt." In *Smith* v. *State*, 63 *Ga.* 168, the following charge was approved: "Before you can convict, you must believe that the prisoner is guilty beyond a reasonable doubt; this doubt must be a reasonable one, not a fanciful doubt. A mathematical certainty is not required; a reasonable and moral conviction of guilt is all that the law requires." This also was a case which depended upon circumstantial evidence. As stated in the first division of the opinion, the judge in the present case had already charged the section of the code relative to circumstantial evidence, and the criticisms upon the excerpt from the charge con-

tained in the fifth ground of the amended motion were not suffi-
cient to require the grant of a new trial.

3.   In the sixth to the twelfth ground of the amended motion
for new trial, both inclusive, complaint was made of the charge,
the substance of the criticisms being that the court erred in charg-
ing on reasonable doubt without going one step further and in im-
mediate connection therewith charging also the law of circumstan-
tial evidence, that "To warrant a conviction on circumstantial evi-
dence, the proven facts must not only be consistent with the hypoth-
esis of guilt, but must exclude every other reasonable hypothesis
save that of the guilt of the accused." There was no other criti-
cism of the charge in these grounds of the motion for new trial.
The judge having elsewhere charged the law of circumstantial evi-
dence as applicable to the entire case, the failure to recharge it in
immediate connection with the law of reasonable doubt, as com-
plained of in the excerpts from the charge contained in these
grounds of the motion, was not misleading, or cause for the grant
of a new trial.

4.   The fourteenth ground of the amended motion for new trial
complained that certain jurors were biased and prejudiced against
the accused.  On the hearing of the motion for new trial evidence
was submitted by affidavits pro and con as to the qualifications of
the jurors.  The evidence so submitted authorized the judge to find,
as he did, in favor of the competency of the jurors; accordingly
there was no error in overruling that ground of the motion for new
trial which complained of the partiality of the jurors.  See *Wall* v.
*State,* 126 *Ga.* 549 (55 S. E. 405), and citations; *McCrimmon* v.
*State,* 126 *Ga.* 560 (55 S. E. 481).

5.   The thirteenth ground of the amended motion complained
that the judge in his entire charge failed to charge the law of cir-
cumstantial evidence, and thereby committed error, because the
case was one that depended entirely upon circumstantial evidence.
But as we have already seen, the judge did charge the code section
on that subject, and the criticism is not borne out by the record. ·

6.   The fifteenth ground of the amended motion for new trial
complained that the judge refused, upon written request timely
presented, to charge the jury: "I charge you that if you find from
the evidence or statement of the accused that calomel or other medi-
cine was administered to the deceased by the defendant in the court

[course?] of his treatment of deceased, and that it was possible for that medicine to contain arsenic, and that fact was unknown to the defendant, and that the quantity of arsenic found in the organs of deceased after death was about the quantity of arsenic which was possible to be in the medicine so administered by the defendant, then your verdict should be for the defendant, and you should acquit him, or if you have a reasonable doubt as to this fact you should acquit him." There was no error in refusing this request. There might be other objections to it, but it would invade the province of the jury for the judge to instruct them as re-quested, relative to the effect of the evidence before them. If the jury should find as outlined in the request, such finding would not necessarily call for a verdict of not guilty. ·

7.　The general grounds complained that the evidence was insuf-ficient to support the verdict. All the other members of the court are of the opinion that the evidence was sufficient; but the writer is of the contrary opinion, for the following reasons: The defend-ant entered upon the trial of the case with the presumption of inno-cence in his favor. The burden was not upon him to prove his innocence, but it was upon the State to prove his guilt to a moral and reasonable certainty and beyond a reasonable doubt. This could be done by circumstantial as well as by direct evidence; but where conviction depends entirely upon circumstantial evidence, the evidence upon every material allegation of the indictment should be not only consistent with the hypothesis of guilt, but should be so conclusive as to exclude every other reasonable hypoth-esis save that of the guilt of the accused. *Bell* v. *State, 93 Ga.* 557 (19 S. E. 244) ; *Williams* v. *State,* 113 *Ga.* 721 (39 S. E. 487). The defendant was a practicing physician; and aside from the evi-dence as to intimacy between himself and the wife of the deceased, there was no more in the case to point to a homicide than there would be in any case where a physician treated a sick patient who afterwards died. Though there were counts in the indictment to support any evidence that might be adduced on the trial, the evi-dence was not sufficient to a moral and reasonable certainty and beyond a reasonable doubt to show that death was produced by poisoning. There was no direct evidence that death was produced by poisoning. The presumption is that he died a natural death, the burden being on the State to show the contrary. There was

direct evidence of seven eighths of a grain of arsenic being found in his remains, but no direct evidence that that killed him. Two grains of arsenic, according to the evidence, is the minimum fatal dose. Whether the deceased ever had more arsenic in his system was a matter by no means certain, and whether he ever had as much as two grains at one time was a mere matter of opinion. The evidence fails to disclose the nature and character of the illness of the deceased which caused him to invoke the services of a doctor. The death might have resulted from that illness. It was at least incumbent upon the State to make some explanation with reference to this. If the evidence had been sufficient to show to a moral and reasonable certainty, and beyond a reasonable doubt, that the deceased came to his death by arsenic poisoning, it was still incumbent upon the State to show in like manner that it was administered by the defendant, or by his direction, with felonious intent. In order to do this, the State again relied upon circumstantial evidence, which, in order to convict, is required to be so conclusive as to be not only consistent with the guilt of the defendant, but to exclude every other reasonable hypothesis save that of his guilt. There was evidence that arsenic is administered in a powder, and is tasteless and odorless, and that it would produce certain symptoms, and that the defendant administered from time to time powder medicines without taste or odor and which produce symptoms of arsenic poisoning; but there was no direct evidence that the medicine so administered was in fact arsenic, while it was testified that the symptoms might result from other causes. It was explained by the prisoner's statement that the medicines which had been administered by him were calomel, sal hepatica, sal laxative, and "fringe tree alternative" (alterative). If arsenic was administered to the deceased, the evidence is not to any degree of certainty that it was administered by the doctor. The deceased was sick for some two weeks, and different people had nursed him, and they might have administered arsenic to him by mistake or design, or he might have taken it himself during the absence of his attendants. The evidence does not purport to show that he was under the watch of an attendant at all times, but showed affirmatively that different people attended him at different times, and no one attended him at all times. If it were said that there was an inducement for the doctor to poison the deceased in order to get rid

of him, so that he might have intimate relations with the wife of the deceased, it might also be said that the same inducement was open to the wife in order that she might have relations with the doctor.　There was no evidence of a conspiracy between the wife and the doctor to kill the deceased; and if the deceased was killed in the manner alleged, it was possible and just as plausible that the wife might have committed the murder as that the doctor did, and that she might have done so without his knowledge or participation in any manner.　Had the law cast the burden upon the defendant to prove his innocence, rather than upon the State to prove his guilt, it might be that the defense would have failed to support the burden; but it being incumbent on the State to prove the guilt of the defendant, the theory of guilt is not borne out by the evidence.

*Judgment affirmed.　All the Justices concur, except Atkinson, J., dissenting.*