SANDERS <em>et al. v.</em> THE STATE.

113  267
Case 2
f130  286

1. If a prisoner, while confined in jail charged with a criminal offense, write a letter in which incriminating admissions are made and give it to the sheriff to mail, and the sheriff open and keep the letter, it is admissible in evidence against the writer, notwithstanding the manner in which it was obtained.
2. Where the evidence affords no indication of any degree of homicide less than murder and would sustain no verdict other than that of murder or an acquit-

tal, it is not error to charge : "There is only one grade of homicide involved in this case, and that is murder," this language, when taken in connection with the entire charge, intimating no opinion as to the guilt of the accused.

3. Upon the trial of several persons for murder, where it was shown that there had been ill feeling between the deceased and a friend of the defendants, and where it further appeared that certain persons had met at a certain place for the purpose of resisting the arrest of this friend, and that the murder was committed at that place, it was not error to admit, as against one of the defendants, evidence of declarations, made by him prior to the commission of the offense, that he was going to that place to take part in an anticipated difficulty.

4. The evidence fully warranted the verdict.

Submitted April 15, — Decided April 24, 1901.

Indictment for murder. Before Judge Evans. Screven superior court. March 2, 1901.

*Raiford Falligant,* for plaintiffs in error. *J. M. Terrell, attorney-general,* and *B. T. Rawlings, solicitor-general,* contra.

SIMMONS, C. J. The record discloses that one Herrington met Stephen Alexander on the public road and had a difficulty with him. Herrington sought the assistance of one of his friends, who advised him to obtain a peace warrant and have Alexander arrested and bound over to keep the peace. Herrington, in pursuance of this advice, went to a magistrate and had a peace warrant issued for Alexander. This warrant was placed in the hands of a constable. The constable, Herrington, Wade, and another went to execute the warrant. When they arrived at the home of the father of Alexander, it was about ten o'clock at night. The constable and Herrington went upon the piazza of the house and notified the father that they had a warrant for the son. The father refused to admit them, saying that night was not the time to serve a warrant. Wade, being well acquainted with the father, advised him to give up the son, and promised that the latter should not be hurt. The father still declining, the constable asked Wade to come upon the piazza. As Wade stepped upon the piazza for the purpose of consulting with the others, numerous persons concealed in bushes in front of the house opened fire with rifles, guns, and pistols, killing Herrington and the constable, and severely wounding Wade. For this offense thirteen persons were indicted by the grand jury of the county, upon a charge of murder. Of these, five were arrested and put upon trial. Upon their trial the evidence, as to the commission of the offense, was substantially as above recited. There

was also evidence that each one of the five had admitted being present at the time and place of the homicide and participating therein. There was also evidence of certain incriminating circumstances. But two of the five made statements upon the trial, both of these admitting therein that they had been present when the homicide was committed and that they had fired their guns, but denying that they had shot at the deceased. The jury returned a verdict finding all guilty. The accused made a motion for new trial. It was overruled, and they excepted.

1. In the progress of the trial the State offered in evidence a letter written by Davis, one of the defendants, which contained certain incriminating admissions. It appeared that Davis, while in jail charged with this offense, had written this letter, sealed and stamped it, and given it to the sheriff with the request that he mail it. The sheriff, after consultation with the postmaster, determined not to mail the letter but to open it. After having read it and ascertained its character, the sheriff turned it over to the solicitor-general for use upon the trial. Objection was made to the admission of the letter in evidence, because of the manner in which it was obtained. The court overruled the objection, and this was alleged as error in one of the grounds of the motion for new trial. No objection was made to the admission of the letter on the ground that it was not admissible against any of the defendants except the one who wrote it. It does not appear that it was admitted as against the others. If the letter was not admissible as against them, we must presume that the trial judge admitted it as against its author only. Its admission was, we think, proper. While the sheriff may have been guilty of improper conduct in not mailing the letter and may have wrongfully seized it after having deceived the writer, this would not render the letter inadmissible in evidence. It may have been that the sheriff acted in bad faith with Davis in opening and reading the letter; but courts will not, in such cases, inquire into the motives of the persons who produce such evidence, nor allow such motives to affect the admissibility of the evidence. Generally courts will not concern themselves with the manner in which evidence is procured, if the evidence is otherwise admissible. Upon this subject see a learned discussion by Mr. Justice Lumpkin in *Williams* v. *State*, 100 *Ga.* 511.

2. The next ground of the motion complained that the court

charged: "Homicide is the killing of a human being; and under my view of the case there is only one grade of homicide involved in this case, and that is murder." This was alleged to be error, because it expressed an opinion on the part of the court that the accused were guilty, and because it deprived the jury of the right to find the accused guilty of any degree of homicide less than murder. The lives of five persons are involved in this case, and we have read very carefully all of the evidence in the record. We find absolutely nothing that could, in any view of the case, warrant a conviction for any lower degree of homicide than murder. There is no hint of any such lower degree. Under the evidence as it appears in the record, the defendants were either guilty of murder or else innocent of any participation in the homicide. The evidence fixed the grade of the homicide. It was murder. The only question for the jury to determine was whether the defendants were present and participating in the crime. The evidence tended strongly to show that they were present, and, while the two who made statements denied that they shot at the deceased, they admitted having been present at the time of the murder and having discharged their guns. We are clear that there was no error in instructing the jury that the defendants should be acquitted or found guilty of murder. *Jackson* v. *State,* 88 *Ga.* 784. We are equally clear, after examining the entire charge of the court, that by the portion objected to no intimation was made as to the opinion of the court with reference to the guilt or innocence of the accused. The charge was, therefore, not erroneous for either of the reasons advanced.

3. The State offered in evidence a statement or declaration of Baldwin, one of the defendants, made before the commission of the crime. It was objected to by the defendants upon the ground that it was hearsay. The other evidence showed, as above stated, that Herrington and Alexander had a difficulty. Alexander's friends seem to have understood, according to the evidence, that an attempt would be made to arrest him that night. Baldwin had heard of this, and, in conversation with the witness a few hours before the time of the murder, "he said that Mr. Herrington met Stephen [Alexander] in the road and they fussed, and he went on and told Stephen that he would see him again, and that he went on up the road and come back after Stephen again, him and Milton Mars [the constable]; he said they had been back after him and could not do

anything, and that they were coming back after him again that night; and he said he was going up and see it well done." This is the evidence to which objection was made. The objection was overruled and the evidence admitted. We must presume that the judge properly limited the effect of this evidence, for the only objection made to it was that it was hearsay. We think the evidence was properly admitted as against Baldwin. It showed that Baldwin had heard of the difficulty between Herrington and Alexander, and had heard that Herrington and the constable would attempt to arrest Alexander that night; and the jury could have inferred from it, in the light of the other evidence, that he meant to go to Alexander's house to assist in resisting the arrest. Whether to "see it well done" meant to assist in the arrest or in the resistance thereto, we can not say. That was a question for the jury to determine in the light of the entire evidence. What was the meaning of the expression, and what probative value should be given to this evidence, were questions for the jury alone to determine. If they construed the language as being in the nature of a threat or declaration of intention to meet others and assist in resisting the arrest of Alexander, they could also have considered it and have given it such probative value as they thought it deserved. If they construed the language differently, its admission was harmless to the accused. At any rate the evidence was admissible. See Wharton, Crim. Ev. (9th ed.) § 756.

4. After a careful reading of the evidence, it seems to us that the defendants were properly convicted. Indeed the evidence showed the homicide to have been an assassination, and the jury could not well have found any other verdict than the one returned.

*Judgment affirmed. All the Justices concurring.*