## HYDE *v.* THE STATE.

No. 14574. July 8, 1943. Rehearing denied July 19, 1943.

W. G. *Mann,* for plaintiff in error. *T. Grady Head, attorney-general, J. H. Paschall, solicitor-general, R. Noel Steed,* and *J. M. C. Townsend, assistant attorney-general,* contra.

Reid, Chief Justice. Carl Hyde was indicted on November 24, 1942, for murder in the killing of J. C. Metcalf, who was about sixty-five or seventy years of age, on November 7, 1942. After trials on November 25, 1942, and January 19, 1943, which had ended in mistrials because of the inability of the jury to agree upon a verdict, a third trial on January 21, 1943, resulted in a verdict of guilty, without recommendation. A motion for new trial was overruled, and the defendant excepted.

A number of witnesses testified, but only a generalized statement of the evidence of the actual occurrence under investigation need be recounted. On the morning of November 7, 1942, about nine or ten o'clock, Carl Hyde, Howard Wimpy, and Wayne Boling, convicts, were engaged in constructing a driveway over a ditch leading from a street to a residence in the Pine Hills Subdivision in Whitfield County. J. C. Metcalf was the guard in charge of the work and the three prisoners. A tile culvert was being placed in the ditch under the proposed driveway. Metcalf was down in the ditch

at the east end, building a headwall, and Hyde, Wimpy, and Boling were on the side of the ditch, shoveling chert on the tile culvert. Hyde was nearest to Metcalf, Wimpy was at the west end of the culvert, and Boling was between Hyde and Wimpy, being nearer to Wimpy and about twelve or fourteen feet distant from Hyde. While Metcalf was in the ditch in a stooping position, facing west, Wimpy saw Hyde strike Metcalf with a shovel on the right side of his head just above his ear. Metcalf fell backwards prostrate upon the ground. He never got up, nor did he speak after having been struck. After striking Metcalf with the shovel Hyde jumped into the ditch, removed Metcalf's pistol from his person, and fled with the pistol in his hand. Boling did not see Hyde strike Metcalf, as his back was turned, but he testified that neither he nor Wimpy struck him, they not being within striking distance of him. Boling turned around, upon Wimpy's exclamation, "God damn, look there," and saw Metcalf leaning back with his teeth partly out, and at the same time he saw some one "go down in the ditch where he [Metcalf] was, or come out." The person going in the ditch, according to Boling, had on stripes, but he did not see his face. He testified that only he, Wimpy, and Hyde had on stripes, and that it was not he or Wimpy that went into the ditch. Boling also ran away immediately, going only a short distance, giving as his cause for so doing, "I was so scared I don't know what I did. . . I left there, but I don't know how far I did go. . . As to why I came back, well, because as quick as I finally got over my scared spell I came back. . . I helped get Mr. Metcalf out of the ditch." Wimpy procured help, removed Metcalf from the ditch, and placed him in an ambulance, and he was sent to a hospital. Medical testimony revealed that Metcalf had sustained a blow from some blunt instrument on the right side of his head just above the ear, resulting in a laceration of the scalp and fracture of the skull, about three or four inches in length, leading down to the base of the skull; and that death resulted from the fracture that night. About a week before the killing several witnesses saw Hyde in the yard of the convict camp, with a blanket under one arm and a pillow under the other arm, stating something about going to the "hot house;" he was cursing Metcalf, invited him with an oath to do a vulgar act, and called him a "grey-headed monkey" and "grey-headed son of a bitch;" he also stated to Metcalf that he would be out some day

and he would get even with Metcalf. Metcalf had not done or said anything to Hyde, except to request him to hush. Shortly after the killing Hyde was apprehended in Chattanooga and returned to jail in Whitfield County, where he was heard to say that he hit Metcalf a glancing lick on the shoulder, while he was breaking dirt, but that it was accidental. In his statement to the jury the accused denied striking Metcalf or throwing anything that hit him. He stated, that Boling went around behind him, and he heard a shovel crash; that he heard Metcalf say "Oh!" that he [accused] jumped in the ditch and took Metcalf's gun, because he was afraid Metcalf would kill him, and was afraid of the other two prisoners. He denied that he cursed Metcalf.

When the case was sounded for trial, and before arraignment, the defendant filed a plea of former jeopardy, alleging that he had been placed in jeopardy for the identical cause on November 25, 1942, in said court, by being at that time placed upon trial which had ended in a mistrial by direction of the judge about nine o'clock p. m. on that date; that the mistrial had been declared by the judge without the consent of the accused and without any "physical, or moral, or other reason," and had not allowed the jury sufficient time within which to consider the case; that such declaration of mistrial amounted to an acquittal of the crime of which he was charged, within the meaning and intent of art. 1, sec. 1, par. 8, of the constitution of Georgia viz.: "No person shall be put in jeopardy of life, or liberty, more than once for the same offense, save on his or her own motion for new trial after conviction, or in case of mistrial." A similar allegation was made with reference to the trial on January 19, 1943, which also ended in declaration of mistrial by the judge on failure of the jury to agree, about eleven o'clock on the morning of January 20, 1943, and the same ground of complaint was urged. A similar plea of former jeopardy had been filed before the arraignment at the second trial of the case on January 19, 1943. The court sustained the State's motion to strike the plea of former jeopardy; and a like motion had been sustained as to the same plea filed on January 19, 1943. Exceptions pendente lite were taken, and error is assigned now on this ruling.

Juries should be afforded ample time and opportunity to reach and formulate a verdict, but "At what time and under what circumstances the court shall discharge the jury from the further con-

sideration of a criminal case, is a question left pretty much to its own discretion," and "The doctrine that a mistrial amounts to an acquittal has long since been exploded." *Williford* v. *State, 23 Ga.* 1; *Avery* v. *State, 26 Ga.* 233. "Two reasons only are recognized by the law as justifying the discharge of the jury before they have agreed upon a verdict and legally returned it into court, to wit: the prisoner's consent, or necessity in some of its various forms, one of which is mistrial." *Nolan* v. *State, 55 Ga.* 521 (2), 524 (21 Am. R. 281). In the opinion in the *Nolan* case Judge Bleckley said: "What amounts to such legal necessity as will justify the discharge of a jury without a verdict is a subject on which courts have widely differed. . . The tendency, of late, has been to lower the standard, so as to comprehend moral as well as physical necessity, and in the region of the moral, to be content with very moderate tests. . . Mistrial, from inability of the jury to agree, is clearly within the principle." "Though the jury trying a criminal case may not have deliberated for more than an hour and a half, the court, if fairly satisfied that they cannot and will not agree upon a verdict, may discharge them and declare a mistrial." *Lovett* v. *State, 80 Ga.* 255 (4 S. E. 912). Other decisions to the same effect might be cited; but since this principle is so well established, it is not thought necessary. There was no error in the ruling complained of.

■ It is not ground for reversal of a judgment denying a new trial in a criminal case that the judge refused to grant a continuance because the sole counsel for defendant had been engaged in the trial of the same case during the two preceding days, which trial had resulted in a mistrial, and had done a great amount of work, and did not feel that he could safely go to trial in a case of such gravity and importance. *Hanye* v. *State, 99 Ga.* 212 (25 S. E. 307); *Rawlins* v. *State, 124 Ga.* 31 (19), 33 (52 S. E. 1); *Brantley* v. *State, 133 Ga.* 264 (4) (65 S. E. 426); *Holland* v. *State, 9 Ga. App.* 831 (72 S. E. 290). The motion for continuance not having met the requirements of any rule that has been called to our attention, permitting continuances, it was necessarily a question presented to the discretion of the judge. *Harrell* v. *State, 11 Ga. App.* 407 (3) (75 S. E. 507). The trial court's discretion in granting or refusing continuances will not be disturbed, unless manifestly, flagrantly, and clearly abused. It not having been made to appear

that there was such abuse of discretion, the action complained of is without merit.

■ Complaint is made that the court committed error in putting upon defendant several jurors who had been put upon him' in the trial of the identical case on January 19, 1943, had been placed upon their voir dire in that case, and had heard testimony at the previous trial, and in not allowing counsel for the defendant time in which to file a challenge to the panel. It appears that in the ensuing colloquy the court stated to counsel for defendant: "You can, if you decide, draw a challenge to the panel, but there is nothing to it." Counsel did not avail himself of the opportunity so extended. But, aside from this, the court was eminently correct in its ruling. "A challenge confined to four jurors is not broad enough to vitiate the array, even though otherwise good. But that jurors, at some previous trial of the prisoner under the same indictment, have been put upon him and one or more of them rejected by him, does not disqualify them, and is not good even as challenge to the poll." *Blackman* v. *State,* 80 *Ga.* 785 (2), 788 (7 S. E. 626); *Robinson* v. *State,* 82 *Ga.* 535 (4) (9 S. E. 528); *Johnson* v. *State,* 130 *Ga.* 22 (60 S. E. 158); *Reid* v. *State,* 50 *Ga.* 556; *Esa* v. *State,* 146 *Ga.* 17 (90 S. E. 278). Nor does the fact that some of the jurors had heard testimony delivered on a former trial of the case afford ground for a new trial, it not appearing that such jurors, from having heard the testimony delivered on oath, had formed and expressed any opinion as to the guilt or innocence of the accused. *Robinson* v. *State,* 82 *Ga.* 535 (4), 545 (9 S. E. 528); *Ford* v. *State,* 164 *Ga.* 638 (5) (139 S. E. 355); *Johnson* v. *State,* 21 *Ga. App.* 497 (8) (94 S. E. 630). Compare *Cunneen* v. *State,* 96 *Ga.* 406 (2), 407 (23 S. E. 412). All the jurors complained about qualified, even though the court allowed counsel for defendant much latitude in propounding questions singly to these jurors upon the voir dire. There was no error in the rulings on the questions involved in these grounds.

■ Error is assigned on the admission in evidence, over objection, of a certain letter and envelope. The words, "To Hazel From Carl Hyde, Dalton, Ga.," were written on the envelope. The letter in part was as follows: "Dearest Sweet Wilf 'For a time I am worried Sure Wish I could be out With you an Free again but as it is I'm facing Death the only way I See from this Jail is the Chair

or a life Sincinence but in Case I Dodge the Chair an get a Sinence I can apeal for a pairden in Six monts an it Depends on What Kind of a prisoner I make an What Kind of life I live an also how bad you wont me out an how you Do  Sweet hairt Mr. Vining told m Just now he Din't thank I wood get the Chair but he believed I wood get life but not to warry in a Short time I wood be out with you. . . he also said thair wood be some Detective try to Date you or get Some one to try to Start a Chatt with you an he said that they wood tell the governer not give me a parden because I mite take some mans life for his Wife an that for you to be good an watch your Step. . . An other thang Jellous All my folt not the first of Yours  I am the Blame for all an Baby you no I wonted to See an be With you all the time an now it Will be good While before we can live togather again an While I gone please be Sweet an true for I am the Murder of one man an I dont want to Kill another man or woman  I put this man to Rest at Dust he went away Free with the Skull crecked an a Crush also an concusion of the Brain  this was a man Who nobody liked an now at Rest in hell because God woulden have a man like him  I have no Sin for killing this man I dont feel like it anyway he never crosses my mine no more than if I had never Kill him my case worries me quite abet an if I dodge the chair I thank I laugh for a while the day he died I saw him that night in my Sleep an never again have I Saw him I dident no he was dead tell the next day after I Saw him that night he died that Day Sugar it is bad but could have been Worse then What it is in a Way. . ." The objection was urged that the letter had not been identified as having been written by the defendant, that it was obtained without authority, that it required the defendant to give testimony against himself, that there was no proof that the letter was in the envelope offered, as there had been two envelopes, and it had not been shown where the letter had been since possession of it had been acquired by witness Tom Crow. There was no objection that the letter was a confidential communication between husband and wife. Tom Crow, a witness for the State, testified, that on November 25, 1942, at the time of the first trial of the case he had the custody of the defendant; that when he returned him to jail that night he searched him and took from his person the letter and envelope, identifying them at the trial, which he later gave to Mr. Vining; that he read the

letter; that no name was signed to it; and that the wife of the defendant was named Hazel. Vining testified that Crow had given him the envelope and letter in question, stating to him at the time that he (Crow) had taken them from Hyde. Vining stated further that he had kept them in his possession since Mr. Crow gave them to him until he turned them over to Mr. Paschall, the solicitor-general, on Monday of that week.

The admission in evidence of the letter and envelope was not subject to the objection that they were not properly identified, and that it had not been shown where they had been kept since they were alleged to have been taken from the defendant, in view of the evidence of Crow and Vining. Other admittedly genuine signatures of the defendant were introduced in evidence for the purpose of comparison, and it was a question for determination by the jury whether the writing on the envelope and letter was that of the defendant. The objection that they were obtained without authority and tended to require the defendant to give testimony against himself is without merit. At the time the search was made by Crow the defendant was in legal custody. He was being returned to jail from the court-house where the trial had consumed the day. The search was in perfect harmony with the diligence and caution of those charged with the custody of prisoners for reasons, of safety. The question of admissibility of evidence obtained from searches made of persons under arrest, even though the arrest be illegal or without warrant, which was not true of the case under consideration, is no longer open for discussion. Citation of a few of the typical cases on this point will suffice. *Williams* v. *State,* 100 *Ga.* 511 (28 S. E. 624, 39 L. R. A. 269); *Pitts* v. *State,* 14 *Ga. App.* 283 (80 S. E. 510); *Calhoun* v. *State,* 144 *Ga.* 679 (87 S. E. 893); *Lester* v. *State,* 155 *Ga.* 882 (118 S. E. 674); *Herndon* v. *State,* 178 *Ga.* 832 (3) (174 S. E. 597). Compare *Sanders* v. *State,* 113 *Ga.* 267 (38 S. E. 841). Otherwise, if the accused is compelled to produce the incriminating evidence. *Calhoun* v. *State,* supra. It was not error, upon any of the grounds urged, to admit the envelope and letter in evidence.

■ Following the introduction in evidence of the letter just discussed, the court admitted, over objection, the signatures of the defendant as they appeared on certain criminal indictments of file in Whitfield superior court. The record of what transpired at the

time of their introduction is as follows: Mr. Paschall (solicitor-general); "We offer in evidence, for the purpose of comparison of handwriting, an affidavit signed on Monday of this week by the defendant, Carl Hyde; we only offer his signature for the purpose of comparison by the jury with the handwriting on the envelope and letter introduced by the State. Also bill No. 35, to the July term, 1942, of this court, the signature of Carl Hyde, for the same purpose." The Court: "That is for the purpose of comparing it with the signature of Carl Hyde on the envelope?" Mr. Paschall: "Yes sir. And also bill No. 31, July term, 1942, that is the signature of Carl Hyde, plea of guilty appearing on that, for the purpose of comparison with handwriting." Mr. Mann: "I object to anything in the bill of indictment and plea tendered, No. 35, July term, 1942, and No. 31, July term, 1942, being criminal indictments in this court. I object to the introduction of them, upon the ground that it seeks and does put the defendant's character in issue, when it has not been put in issue by the defendant; and if they go in they can not help answer that, whether they are considered or not." The court: "He is offering nothing but the signature of Carl Hyde; and I will instruct the jury that these bills of indictments should not be considered by them touching upon the defendant's character and should not be considered in any way in this case; the only thing to be considered is whether the document thus introduced is the signature of Carl Hyde. It is admitted that that is his genuine signature upon those two indictments and his genuine signature upon that affidavit, signed Monday; the signatures are in evidence, it is in there for the purpose of comparing the signature of Carl Hyde on those three documents with the signature of Carl Hyde on the envelope of this one and the letter, in order for the jury to determine whether or not from that, whether Carl Hyde wrote this letter."

In ground 4 of the motion the defendant seeks to treat the action of the court as admitting in evidence the indictments *as such;* but a note attached to this ground and signed by the judge confirms what has been set forth above from the record, since it is stated in this note: "Only the signatures of defendant on the bills and plea were offered or admitted, and this only for the purpose of comparison with writing on envelopes and letter introduced. However, the physical indictments went out with the jury." Photo-

graphic copies of the indictments on which the signatures appeared have been sent up with the record. Both of the indictments were returned to the July term, 1942, of court. One charged the defendant with pointing a pistol at another; the other with the offense of carrying a concealed weapon. On the back of each indictment appears the sentence of the court, pursuant to the defendant's plea of guilty. The sentences are dated August 19, 1942. One sentence imposed a fine of $50 and twelve months in the chain-gang, and upon the payment of the fine and costs of court the chain-gang sentence to be served outside of the penal institution during good behavior. The other sentence was for twelve months in the chain-gang, to be served outside of the penal institution during good behavior, upon payment of costs. It does not appear from the record whether or not the defendant, who was a convict at the time of the alleged murder, was in penal service in pursuance of the sentences under these indictments. All that transpired as contained in the above recital, so far as the record shows, took place in the presence of the jury. It dose not appear from the record that the contents of the indictments were either read or called to the attention of the jury. While the objections urged, as well as the claims made in this ground of motion for new trial and the argument now advanced before this court, are treated by counsel for plaintiff in error just as if the indictments themselves were admitted in evidence, in view of the recital of the judge, and the record itself, our consideration must be limited to the question whether the references made to them in the presence of the jury and their being sent out to the jury under instructions presently to be mentioned amounted to reversible error, thus treating this question as being embraced within the assignments made. One of the vital issues in the case was whether or not the letter taken from the person of the defendant was genuine; that is, whether or not it had been written by him. The State sought to carry the burden of showing that it had been written by him, and that the signature appearing on the envelope in which it was contained was his genuine signature. The signatures on the indictments were genuine signatures of the defendant. Other handwriting and signatures made at other times are generally admissible for the purpose of comparison by the jury, when such signature is disputed. Code, § 38-709; *Modern Order of Prætorians* v. *Blackburn,* 42 *Ga. App.* 690 (2) (157 S. E. 331);

*Thomas* v. *State,* 59 *Ga.* 784 (5). The defendant denied writing the letter, and denied any knowledge of it. If he did write it, it betrayed not only strong evidence of guilt but also a malignant heart and state of mind.

In the charge to the jury the court said, in regard to the indictments: "Gentlemen, there has been introduced in evidence upon the trial of this case a certain letter and envelope in which the State insists that this letter was written, and taken by Mr. Crow from the person of Carl Hyde, the defendant. That upon the back of that envelope has written the words, 'To Hazel, from Carl Hyde, Dalton, Georgia.' The State insists that the letter was contained in that envelope, and that it was taken from the person of Carl Hyde. There has also been introduced in evidence, gentlemen, certain documents, which appear to be two indictments. The only thing that these indictments are introduced for, and the only part of these indictments that will be considered by the jury, is that part only containing the name 'Carl Hyde,' simply for comparison of that signature of Carl Hyde with the signature of Carl Hyde upon the envelope and letter, which the State insists was taken from the person of Carl Hyde. That is true as to both indictments; and I caution the jury to not consider anything else in these two indictments, other than the signature of Carl Hyde, and that simply and purely for the comparison of signatures of the name, Carl Hyde, appearing upon the envelope in which the State insists this letter was contained. These indictments and pleas of guilty should not in any way be considered by the jury as affecting in any way this case, or affecting the character or reputation of the defendant, Carl Hyde." While the judge referred to the documents as indictments and spoke of their having been introduced in evidence, it will be noted that when this part of his instruction is analyzed he merely adopted another way of saying that only the signatures were actually in evidence. There is authority for the proposition that "evidence that is material and relevant, offered by the State in the prosecution of one for a violation of the criminal law, is admissible even though it may tend incidentally to put the defendant's character in issue." *Howell* v. *State,* 162 *Ga.* 14, 22 (134 S. E. 59). "Accordingly, on the trial of a criminal case the State may introduce any competent, relevant, and material evidence for the purpose of disproving the contention of the defendant, or for the pur-

pose of discrediting his defense, and it affords no valid ground of objection that such evidence may tend incidentally to put the defendant's character in issue." *Owensby* v. *State,* 149 *Ga.* 19 (98 S. E. 552); *Smith* v. *State,* 148 *Ga.* 467 (96 S. E. 1042); *Little* v. *State,* 150 *Ga.* 728 (105 S. E. 359); *Wilson* v. *State,* 150 *Ga.* 285 (103 S. E. 682). But these cases do not furnish an exact guide here, as might be true if the indictments themselves had been admitted.

We have been unable to find any controlling authority that would apply to the exact situation before us. By analogy the situation presented is somewhat similar to cases where irrelevant testimony or other evidence has been either tentatively admitted, and later is withdrawn from consideration of the jury upon instructions from the court that they shall give no consideration to it, although it may have been read or uttered to them and for the time being may have been before them for their consideration, or cases where irrelevant and prejudicial testimony may have been elicited from witnesses in the hearing of the jury, and excluded by the court with the admonition that the jurors disregard and give no effect to it. The same situation is sometimes presented where argument of counsel is held by the judge to transgress proper bounds, and where the judge warns and instructs the jury that such argument must be put out of their minds. It is true that there have been instances where the court upon review of such circumstances (the case having once been before the jury) has held that it would be presumed to have had its evil effect on the jurors' minds, and new trials have been granted on this account. *Fitzgerald* v. *State,* 184 *Ga.* 19 (190 S. E. 602), and cit.; *Downer* v. *State,* 10 *Ga. App.* 827 (74 S. E. 301). See *Rentfrow* v. *State,* 123 *Ga.* 539 (51 S. E. 596), where it was held that where the court instructed the jury to disregard certain evidence relating to the character of the accused with reference to violence, which had been previously admitted over objection, conceding its admission to be erroneous, the error was completely cured. *Withrow* v. *State,* 136 *Ga.* 337 (3), 338 (71 S. E. 139). But in the present instance these indictments as such were never tendered or admitted in evidence. There was no suggestion or indication in the record that this method of proving the signature was resorted to as a device or a competent means of doing that which might otherwise be forbidden. So far as appears, this was but an

effort in good faith to present genuine signatures for comparison by the jury; and unless we assume that the jury in violation of their duty and of their oaths disregarded the instructions of the court, we can not reach the conclusion that prejudicial error was committed. It may be true, as urged by counsel, that signatures of the defendant could have been found elsewhere or on other documents; but on this subject the record is silent. The indictments were part of the public records of the county, and could not be mutilated or so handled as to destroy their character as records. It is true also that in such cases, at least where parties can consent, it would seem to be better practice to use some practical method, as is sometimes done by concealing from the jury irrelevant and prejudicial portions of such documents; but there seems to have been no such proposal in the present case.

■ Nor was there error in the court's failure to give in charge to the jury the law on impeachment of witnesses, it not appearing that any proper request therefor was made. *Downing* v. *State,* 114 *Ga.* 30 (3) (39 S. E. 927); *Joiner* v. *State,* 105 *Ga.* 646 (4) (31 S. E. 556); *Boynton* v. *State,* 115 *Ga.* 587 (3) (41 S. E. 995); *Hunter* v. *State,* 136 *Ga.* 103 (4) (70 S. E. 643); *Douberly* v. *State,* 184 *Ga.* 573 (5) (192 S. E. 223); *Howell* v. *State,* 160 *Ga.* 899 (2) (129 S. E. 436); *Brown* v. *State,* 148 *Ga.* 509 (97 S. E. 69); *Thomas* v. *State,* 150 *Ga.* 269 (103 S. E. 244).

■ During the argument to the jury the solicitor-general referred to the defendant as "a killer of the worst sort," and made some reference to the effect that "too many pardons have been granted in Georgia." Defendant's counsel moved that the court declare a mistrial, because such argument was harmful, prejudicial, and without evidence to support it. The court instructed the jury not to consider that part of the argument with reference to there being too many pardons granted in Georgia, as there had been no evidence in respect thereto. With reference to the statement that the defendant was a "killer of the worst sort," the court instructed the jury that the solicitor-general "is arguing that from the statement which he contends is in a letter which he contends that the jury will be authorized to find that the defendant did write. It is an inference which he might or might not be authorized to make. Of course the jury will determine from the facts and circumstances whether he wrote the letter, or whether or not those statements in

there would show that statement to be true; that is all questions for the jury. With those instructions, I will overrule the motion." This court has not always been unanimous, or even consistent, in dealing with the question of improper argument to the jury by counsel. It has, however, always recognized the importance of keeping the mind of the jury as completely free and untainted as possible from the influence of prejudicial and inflammatory remarks in the trial of criminal cases, such as is likely to occur during the tenseness which is usually present where a person's liberty or his life is dependent upon the outcome. There can be no absolute standard of language or combination of words the use of which will require the court to take from a jury a case upon motion. In the trial of every case there is an imaginary line which marks the limit of argument or of inferences to be drawn from the evidence delivered. Prosecuting attorneys, sometimes zealous to a fault in the service of the sovereign, are on occasions unable to encompass themselves within these imaginary limits, and are prone to tread upon the edge of error in the heat of battle. Hence the unyielding necessity for resort in such instances to the discretion of the trial court. And it is a discretion which will not be interfered with or disturbed, unless manifestly abused. The difficulty is in determining when such discretion has or has not been abused. For instance, in *Biggers* v. *State,* 171 *Ga.* 596 (156 S. E. 201), the court was evenly divided on the issue where error was assigned upon the refusal of a new trial, because the assistant solicitor-general, arguing the case for the State, said: "It would be useless to convict this man and recommend the accused to the mercy of the court with any assurance that he would serve for life; for statistics show, but I can't quote statistics, but I will say it is a matter of general information that probably half or a great per cent. of the life convicts either succeed in making an escape or are pardoned by some overly sympathetic Governor." In *Manchester* v. *State,* 171 *Ga.* 121 (155 S. E. 11), the court by unanimous opinion affirmed the refusal to declare a mistrial, on motion, because the solicitor-general in argument to the jury employed more extravagant language in this regard, and equally if not more inflammatory than that used in the *Biggers* case, supra. In the instant case the record is not clear as to the nature of the argument made by the solicitor-general at the time the statement,

"too many pardons have been granted in Georgia," was uttered. The fact that a person serving a life sentence may be subject to pardon may, after all, justify comment if kept within reasonable bounds. The court instructed the jury not to consider it, and evidently the solicitor-general did not again refer to it.

When the solicitor-general referred to the accused as being a "killer of the worst sort," we may assume, in view of the court's instruction to the jury in this connection, that he was summing up the effect of and drawing inferences from contents of the letter taken from the person of the accused, and previously discussed in this opinion. The jury were told that such argument was an inference that the solicitor-general might or might not be authorized to draw from the letter, if they determined that the letter was written by the accused; and that it was their province to determine whether such inference was authorized. "What the law forbids is the introduction into a case, by way of argument, of facts not in the record and calculated to prejudice the accused. The language of the solicitor was somewhat extravagant; but figurative speech has always been regarded as a legitimate weapon in forensic warfare, if there be evidence before the jury on which it may be founded." This quotation is from the opinion by Mr. Justice Evans in *Taylor* v. *State*, 121 *Ga.* 348, 354 (49 S. E. 303). See also *Powell* v. *State*, 179 *Ga.* 401 (4) (176 S. E. 29) ; *Haden* v. *State*, 176 *Ga.* 304, 313 (168 S. E. 272). In view of the totally malignant heart revealed by the contents of the letter, if the jury should find it was written by the defendant, the judge might well have considered the comment entirely legitimate. The issue being one to be resolved by the discretion of the court, we can not say that the judge abused his discretion in refusing to declare a mistrial.

■ On two occasions while the jury were pursuing their deliberations the court recalled them and inquired if they had reached a verdict. Upon their first recall the court was informed that a verdict had not been reached, that the jury stood numerically 10 to 2, and that the "age of the defendant seems to be worrying some of them" (the jury). The defendant in his statement had given his age as twenty years. The court then proceeded to instruct the jury respecting the age at which a person becomes accountable for his acts in relation to committing crimes. It can

not be stated from the facts disclosed by the record that the jury did not, although they did not specifically request it, desire further enlightenment in this regard. On recalling the jury the second time the court ascertained by query that there had been no change in the division, and then charged the jury, without request, as follows: "Well Gentlemen, cease your deliberations at one o'clock. I have been up in court a couple of nights all night, and am going home at one o'clock and get some sleep. I hope after one o'clock you will make yourselves as comfortable as you can back there in the room. This is three juries that have had this case. This jury is a very intelligent jury; this jury is as capable of reaching a verdict in this case as any jury that will ever be empaneled in this case in Whitfield County. A verdict is the combined judgment of twelve; it is not a verdict of ten, or two men or four men. In viewing a case every juror should look at the evidence, giving due weight to the defendant's statement, in an honest conscientious effort to arrive at a verdict which speaks the truth. The two should look at it and view it in the light and viewpoint of the ten, and the ten should look at the case and view it in the light and viewpoint of the two, and try to get together and reach a verdict. The ten should have a reason and be able to give a reason for their view. Likewise the two should be able, following the law and the evidence, giving due weight to the defendant's statement, to give a valid, legal reason for their view. In that way, that is the way verdicts are reached; no verdict should ever be made except that which follows the law, applying the law as given you in charge to the evidence, and the evidence that is introduced on the trial of the case, giving due weight to the defendant's statement. There should not be any verdict of any jury, any ten or any two or any other number, should be based on anything outside of what is disclosed upon the trial of the case from the evidence and the defendant's statement, applied to the law as given you in charge by the court. The law you take from the court, and apply it to the facts as come from the witness-stand; that is, all the evidence, documentary as well as that of the witnesses, and giving due consideration to the defendant's statement. This jury can reach a verdict in this case as well as any other jury. We don't have any court anywhere else this week. I will let you go to your room. I will be here at one o'clock; at that time I

am going home and go to bed; and then I will be back at nine o'clock in the morning. You can deliberate on through the night if you want to, and I will be back at nine o'clock to receive the verdict. Or if you think you are close to a verdict at one o'clock, I will wait a few minutes, not much, but not much; in three nights a fellow gets a little tired." The contention of the defendant is that the court committed error (1) in unduly and repeatedly stressing and urging the jury to make a verdict in the case, and pointing out that there was no court anywhere else that week; (2) in recalling the jury and recharging them without any request from the jury therefor, and without any legal or other reason therefor; and (3) because said charge was argumentative and intimidating.

It clearly appears from the record that when the jury were recalled the first time, there was a question of law "worrying them." It was not only the court's prerogative but its duty to inform the jury on any question of law about which they were confused, when such confusion was apparent to the court, although there was no specific request from the jury for such a charge. However, "The court may, in its discretion, recharge the jury without a request from them." *Marcus* v. *State*, 149 *Ga.* 209 (5) (99 S. E. 614), citing *Parker* v. *Georgia Pacific Ry. Co.*, 83 *Ga.* 539 (10 S. E. 233); *Jeter* v. *Jones*, 135 *Ga.* 22 (3) (68 S. E. 787).

A great number of cases have been before this court where complaint was made that the trial court unduly pressed the jury to make a verdict. It has been held that "Juries should be left free to act without any real or seeming coercion on the part of the court." *White* v. *Fulton*, 68 *Ga.* 511. And "The court should not unduly press a jury to agree upon a verdict; and in the use of any remarks designed to impress the desirability of reaching a verdict, he should be careful to refrain from any expression of a coercive nature or which possibly may mislead them into an erroneous method of reaching a verdict." *Alabama Great Southern R. Co.* v. *Daffron*, 136 *Ga.* 555 (71 S. E. 799, Ann. Cas. 1912D, 438). "It is much better for trial judges to be conservative in such matters." *Gambo* v. *Dugas*, 145 *Ga.* 614 (89 S. E. 679). The statement by the court in the present case, as was said by Chief Justice Bleckley in *Parker* v. *Ga. Pac. Ry. Co.*, supra, "was not unduly pressing the jury to a verdict, though it went,

492

perhaps, to the allowable limit." The judge in the instant case, though firm in admonishing the importance of juries making verdicts, was careful not to intimate or express any opinion as to the propriety of any particular verdict, nor did he make any suggestion tending to coerce any particular group of the jurors to agree with the others. On this subject see *Jones* v. *State,* 117 *Ga.* 710 (44 S. E. 877); *Patterson* v. *State,* 122 *Ga.* 587 (50 S. E. 489); *Golatt* v. *State,* 130 *Ga.* 18 (60 S. E. 107); *Gambo* v. *Dugas,* supra; *Yancy* v. *State,* 173 *Ga.* 685 (5) (160 S. E. 867); *McKibben* v. *State,* 187 *Ga.* 651 (2 S. E. 2d, 101); *Gaddy* v. *Harmon,* 191 *Ga.* 563 (13 S. E. 2d, 357); *Peavy* v. *Clemons,* 10 *Ga. App.* 507 (73 S. E. 756); *Dalton Fruit & Produce Co.* v. *Puryear,* 22 *Ga. App.* 489 (96 S. E. 344); *Baker* v. *Augusta Veneer Co.,* 46 *Ga. App.* 768 (169 S. E. 254); *Georgia Railroad* v. *Cole,* 77 *Ga.* 77; *Ball* v. *State,* 9 *Ga. App.* 162 (70 S. E. 888); *Long* v. *State,* 59 *Ga. App.* 389 (1 S. E. 2d, 32); *Arkansas Fuel-Oil Co.* v. *Andrews Point Co.,* 64 *Ga. App.* 595 (13 S. E. 2d, 738). Considering the language used in the present case in the light of former rulings of this court and in further consideration of the abundance of evidence on behalf of the State, thus keeping in mind that this could not be said to be one of that class of cases where the issues turned on such a narrow thread as has appeared in some of the cases cited, where reversals were ordered, we can not say that the charge complained of was error requiring a reversal of the denial of a new trial.

The evidence amply supported the verdict, and the judge did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except*

ATKINSON, J., who dissents from the ruling in division 5 of the opinion.