1. The evidence authorized the verdict of guilty.
2. The court did not err in excluding testimony by the officer who brought the defendant from another State back to this State, as to statements made by the defendant in the city of his arrest, since such testimony so far as it could have benefited the defendant amounted to only a self-serving declaration.
3. While it is true that a general charge on the subject of voluntary manslaughter in the language of the Code will not suffice, where under the *Page 177 
evidence, as distinguished from the statement of the accused, the jury would be authorized to find that the homicide occurred under circumstances showing a mutual intention to fight (Waller v. State, 100 Ga. 320, 28 S.E. 77; Findley v. State, 125 Ga. 579 (3), 583, 54 S.E. 106; Buchanan v. State, 153 Ga. 866, 869, 870, 113 S.E. 87; Shafer v. State, 191 Ga. 722 (3, 4), 13 S.E.2d 798, and cit.), the evidence in this case shows that the deceased was actually shot and killed while standing unarmed with only a rag and a package of cigarettes in his hand, which he had removed from his pocket; and there is nothing in the testimony which would have authorized a charge on the law of mutual combat. See Irwin v. State, 194 Ga. 690
(22 S.E.2d 499); Mims v. State, 188 Ga. 702 (7), 706 (4 S.E.2d 831); Brannon v. State, 188 Ga. 15, 19
(2 S.E.2d 654); Tate v. State, 46 Ga. 148, 158; Slocumb v. State, 157 Ga. 131 (3) (121 S.E. 116); Crawford v. State, 149 Ga. 485, 488 (100 S.E. 633).
4. The instruction on the law of flight from the scene of a crime shows no prejudicial error.
5. Even where the law of voluntary manslaughter, under the Code, § 26-1007, is involved under the evidence, or is charged without exception by the defendant, and where the law of justifiable homicide, under §§ 26-1011 and 26-1012, is involved, and instructions are given as to the legal rules in the sections stated, it is not error, as here complained of, to fail to charge the law of justifiable homicide in immediate connection with the charge on the general law of voluntary manslaughter. Walker v. State, 186 Ga. 882, 884
(199 S.E. 231); Gossitt v. State, 182 Ga. 535 (4), 538 (186 S.E. 417); Deal v. State, 145 Ga. 33, 34 (88 S.E. 573).
6. The statement by the solicitor-general in his argument to the jury, that the defendant shot the deceased "like a bloodthirsty wretch," did not require that a mistrial be declared, where such statement, in reply to a similar statement with reference to the deceased by counsel for the defendant, was not made extraneously but as a deduction from testimony for the State, discussed in connection therewith.
Judgment affirmed. All the Justices concur.
 No. 14365. DECEMBER 2, 1942. REHEARING DENIED DECEMBER 14, 1942.
Willie Fann was found guilty, with a recommendation to mercy, of the murder of Marvin Kelly. The defendant offered no testimony, but relied on his statement to the jury, as follows: "We were skinning there in the house. Tit Kelly [deceased] fell on an eight spot, and I asked him for my money. He told me he would not give it to me, and he jumped and put it in his pocket. He jumped up and ran to the door and put his hand in his hip-pocket. He put his hand in his hip-pocket, and he leaned up against the door where I could not get out, I would have run out. *Page 178 
There was a pistol lying there on the shelf. I knowed that he have shot several folks and cut them, and I figured he would do me the same way, and I grabbed the pistol and went to shooting. I would not have shot him for nothing in the world. I didn't want him to hurt me. Me and him have never had an argument before then, until then. . . He shot a girl up there in Three Centa Alley, a girl called Geneva, and the same boy that was up there testifying against me, he shot at him too, and he shot a boy named, I think they call him Grady; he shot him through the arm and shot the woman through the stomach, and he cut up people, and I know he would have did me the same way. I was not shooting to kill him. I was trying to keep him from hurting me."
Daisy Knight testified for the State, that she was present on the night of the homicide, when a gambling "skin game," was in progress between the defendant, the deceased, and two others; that the deceased "held down the card," and the defendant said, "Give me my money," and the deceased said, "I am not going to give you nothing;" that the defendant "claimed his card, had fallen off the deck, . . all the other players had a card, and when their card fell they lost. . . [Defendant] claimed [deceased's] card had fell; [deceased] said it had not fell, and he said he would not give his money back; and [deceased] jumped up, and when he jumped up, [defendant] shot. [Deceased] picked up the money and put it in his pocket, going towards the door. He was almost nearly at the door. The next thing I knew I heard a shot. [Defendant] shot, I reckon he did, yes, sir. I saw [deceased] when he got to the door; he was standing at the door then. The door went out of the house. . . The door was latched. . . He reached for the latch on the door . . backed to the door and reached like he was going to open it. This was after the first shot was fired; [deceased] said, `Here is your money,' and he throwed him a rag. [Defendant] said, `That ain't my money.' He shot again at that time. . . When I got out I was running behind [defendant]. . . He still had the pistol. . . Everybody but the dead man came out of the house. I went back in when the others went in there. . . I was right there when [the coroner] came there. No one had bothered the dead man's pockets before they came there. . . That happened in Harris Alley in Macon," March 23, 1942. "I don't know where [defendant] went *Page 179 
the night of the shooting. . . I did not see [deceased] try to hurt [defendant] in any way. I did not see any pistol or knife or any weapon that [deceased] had. I did not see him try to use any weapon at all. All I saw him do was try to get out the door."
On cross-examination, this witness testified: "All of them were drinking." Witness had told the coroner at the inquest that defendant "shot once," and deceased "was right at the door when he first shot. . and when he shot again [deceased] was falling towards the middle of the house. . . It seemed [deceased] was trying to get hold of the latch. I don't know if it could have seemed like he was going to get a gun out of his pocket."
E. B. Law testified, that he was present at the gambling game; that there was an argument, as the preceding witness testified; that deceased "backed to the door and told [defendant] he did not owe him nothing. [Defendant] said, `Yes, you are going to give me my money,' and he turned and reached on the mantel piece and got a pistol. . . He asked [deceased] for his money again, and [deceased] backed to the door and put his hands behind him like that. . . [Defendant] throwed the pistol on him, and [deceased] kept getting closer to the door, and [defendant] shot. [Deceased] still backed up to the door. He put his hand up behind him. . . I could not tell whether he was reaching in his pocket for anything or reaching for the door latch, he had his hand behind him. He put his hand in his pocket; when he shot him he brought out a little rag and cigarette package like that. Before he was shot he put his hand in his front pocket, and when he backed to the door he put his hand back like that. I did not see him put his hand in his back pocket before he shot, for he backed up to the door with his hand behind him, and then [defendant] shot. Then [deceased] reached and pulled out a rag and cigarette pack. It was a package of Chesterfields; it had two cigarettes in it. [Deceased] said `Here is your money.' When [defendant] throwed the pistol on him he turned his side, and [defendant] shot. He turned his left side. When he got the rag and cigarette package and offered him, [defendant] said that was not his money, that was a rag, and he went to walking towards [defendant] and [defendant] shot him. I don't know if he was walking towards [defendant] or falling towards him. . . [Deceased] was standing there with the rag and cigarette pack in his hand when he *Page 180 
shot the second time. . . He had the rag and cigarette package in his hand; he took a step or two with that in his hand, and the pistol fired, and he fell. I don't know whether he hit him the first or second shot. When the first shot was fired, [deceased] was standing up against the door. . . I did not see [deceased] with a weapon at all that day. I did not see him try to hurt [defendant] at all."
L. H. Chapman, the coroner, testified that the deceased had on his person only some money, a gas pressure-gauge, a device for taking value cores out of automobile tires, and a rag by his side; but did not have "any knife or any pistol or any kind of weapon on him;" and that witness found only one wound, in the left side, about the second rib from the bottom.
W. C. Bowden, a city police officer, testified that he brought the defendant back with requisition papers from Boston, Massachusetts; and that the defendant had told him as to running from the scene of the shooting, getting an automobile ride to Atlanta, and going to Boston.
On direct examination, this witness testified that the defendant, in demanding requisition papers after being taken before a municipal judge in Boston, made the statement that "he wanted to be tried there, he didn't think he would get over three or four years if he was tried in Boston."
As to the ruling made in headnote 2 on the exclusion of testimony from this witness, offered on cross-examination, counsel for the defendant read extracts from a Boston newspaper, dated twelve days before the witness arrived in that city, which purported to state alleged facts with regard to the defendant and the homicide, his alleged statement in Boston that he had informed his draft board as to his new address, and his further alleged statement to the judge in Boston: "I shot a fellow; it's me they want, I don't want to make any trouble." After reading this newspaper account without objection, counsel said to the witness: "I ask you if it is true . . did he tell that to the judge?" to which the witness replied, "No, sir," but that the witness did not know what happened before he reached Boston. Counsel then read a further extract from the same newspaper, as follows: "The unusual study in psychology was presented to the authorities yesterday as Georgia officials were en route here to take [defendant] back to try him on *Page 181 
a charge of murdering [deceased]. The killing occurred during a card game in Macon. `We had an argument and [deceased] reached for his hip-pocket. I knew he'd shot people. There was a gun on the table. I didn't wait for him to get his hand from his pocket. I grabbed the gun and shot him' — was the simple way [defendant] told the story." After reading this extract from the newspaper, counsel asked the witness, "Did that happen?" Following the answer that the defendant "told me that, he didn't tell the court that," the judge excluded the testimony on objection by the State, without mention of a specific ground. The defendant excepted to the exclusion as error, on the grounds, that the testimony was relevant for the jury "to consider in determining whether movant had an explanation for requiring extradition papers to be issued and to rebut an inference of a consciousness of guilt which the State was contending the jury should draw from the fact that extradition papers had been demanded by movant;" that the State in objecting to the testimony had assigned no particular ground of objection; and that the State had gone into conversations between the defendant and the witness as to the reasons of the defendant for demanding extradition, and therefore he was entitled "to have the entire statement in evidence." As to the latter ground, there was no testimony to indicate that the excluded testimony formed part of any particular statement by the defendant, evidence as to which had been admitted.
As to the ruling in headnote 4, relating to the instruction on the subject of flight, the judge charged: "Flight, if any, by one who is alleged to have done an act alleged to be a crime, immediately after the act, and similar acts, if proven, from which an inference of consciousness of guilt may be drawn, may be considered by the jury. But flight is subject to explanation. The weight to be given to it or whether the jury will draw an inference of consciousness of guilt or not from it is for the jury. It is for the jury to determine whether the defendant did flee immediately after the alleged commission of the alleged offense; and if so, whether such flight was due to consciousness of guilt or to other reasons. If due to other reasons, no inference harmful to the defendant may be drawn by the jury." Exception is taken to the language, "flight is subject to explanation," because the judge did not expressly charge in this connection that "similar acts" are also *Page 182 
subject to explanation, on the ground that the omission was prejudicial in view of testimony by the officer who brought the defendant back from Boston that the defendant told him that the reason for demanding extradition papers was the defendant wanted to be tried in Boston, as "he didn't think he would get over three or four years if he was tried in Boston."
As to headnote 6, relating to the refusal to declare a mistrial on the ground that the solicitor in his argument had denounced the defendant with inflammatory and prejudicial remarks, the statement with its context was as follows: "May young friend . . who represents the defendant has argued to you that the deceased in this case was a dangerous, bloodthirstyman walking the street from place to place, seeking whom he might devour. I tell you that you are authorized in this case tofind that the dangerous, bloodthirsty man is the defendant
sitting there by my young friend on the other side of the table. He is the man that must have brought the pistol there that was used in the homicide, because he knew right where it was, and he put his hands directly on it when the occasion arose for him to use it, and he is the one that under the evidence took the pistol away. He did not shoot the deceased in self-defense as he claims, but he shot the deceased because he took a dollar and a half out of a gambling game in which they were both engaged, and when he took the dollar and a half and backed to the door, trying to get out of the door, that is when the defendant . . shot him and inflicted a mortal blow. . . After he had been mortally wounded, the deceased reached in his pocket and pulled out a little rag and said to the defendant, `Here is your money.' The defendant,like a bloodthirsty wretch, said, `That is not money but a rag,'and shot him again after he had already mortally wounded him."