### 37097. INGRAM *v.* THE STATE.

470

*Swift Tyler, John Tyler, Marvin O'Neal, Jr.,* for plaintiff in error.

*Paul Webb, Solicitor-General, Carter Goode, Eugene L. Tiller,* contra.

Townsend, Judge. ■ The first 3 counts of the indictment, except in so far as they name different persons as those to whom bribes were given, contain identical allegations that the defendant "did unlawfully give to _____, a policeman of the City of Atlanta, Fulton County, Georgia, a sum of money, the exact amount of which is to the grand jurors unknown, as a present and reward to influence the behavior of the said _____ in the discharge of his official duty, said sum of money being given by the accused to the said _____ to influence the said _____ to refrain from arresting the said accused and certain unknown persons who are to the grand jurors unknown, for violating the lottery laws of Georgia, which says that 'Any person who by himself or another shall keep, maintain, employ or carry on any lottery or other scheme or device for the hazarding of money or valuable thing shall be guilty of a misdemeanor'; (2) and to refrain from arresting the said accused and said unknown persons for violating the law of Georgia relating to disorderly houses, Code § 26-6103, which says that 'Any person who shall keep and maintain, either by himself or others, a common, ill-governed and disorderly house, to the encouragement of idleness,

gaming, drinking or other misbehavior to the common disturbance of the neighborhood or orderly citizens, shall be guilty of a misdemeanor'; (3) and to refrain from arresting the accused and said unknown persons for violating the lawful ordinances of the City of Atlanta, Georgia, relating to the operation of motor vehicles upon the public streets of said city; and the said money having been received by the said _____ as a reward to influence him, the said _____ to refrain from arresting the said accused and said unknown persons for violating the law as aforesaid, which violations of law were known to the said _____; and the said money was so accepted by the said _____ to influence his behavior in furnishing police protection to the said accused and the said unknown persons who were engaged in the violations of law as aforesaid."

■ Demurrers to each of the first 3 counts are urged on the ground of indefiniteness, uncertainty and lack of particularity in that it does not appear whether the bribe was made on one occasion or on three separate occasions, and whether the accused is being charged with one or several offenses. Code § 26-4101 defines bribery as the giving of an undue reward to influence the behavior of the person receiving it in the discharge of his duty in any office of government. The essential elements of the offense are accordingly the offer or gift, the purpose to corruptly influence, and the official status of the offeree. The offer may be made to one in the designated status with an intent to corruptly influence in more than one way. "An indictment may charge two distinct acts done by the defendant and still be a good indictment. Thus, an indictment [for bribery] is not bad for duplicity because it charges that the accused sought to influence an officer's vote in the body of which he was a member and also in a standing committee of such body." 8 Am. Jur. 898, Bribery, § 20. Properly construed, each count of the indictment charges the giving of a bribe for the purpose of police protection, the illegal protection to be extended to the defendant and others in regard to three separate violations of law. So construed the indictment meets the test of Code § 27-701 and *Johnson* v. *State*, 90 *Ga*. 441 (16 S. E. 92) that the offense shall be described in the language of the statute and with sufficient particularity to enable the defendant to be able to prepare for trial.

472

■ Count 4 was drawn under the provisions of Code (Ann.) § 26-4102 making it an offense to give or offer a bribe "or use any promises, threats, persuasions, or other like sinister, unfair, or fraudulent practices in order to obtain or influence the opinion . . . of . . . any . . . officer of this State." A policeman of the City of Atlanta is an officer of this State within the meaning of this law. *Payne* v. *State*, 153 *Ga.* 882 (3) (113 S. E. 446). This count charges the defendant in the language of the statute, and then states "said promises, threats, persuasions and other like sinister, unfair and fraudulent practices being made and done by accused saying in substance to said Clark and Appling the following language, to wit: 'I've got more power and more politics than either one of you and you won't be on this beat a week before I have you moved, and I'll bet you a thousand dollars I can.'" This count was additionally demurred to on the ground that it did not inform the defendant as to what other "like sinister, unfair and fraudulent practices" in addition to threats, promises and persuasions, were being charged. Under the clear wording of this count, the quoted language is charged as being threats, promises and persuasions, and also as being other like sinister, unfair and fraudulent practice, and the statutory language is accordingly limited by the more particular description of the language used. It therefore does not fall under the rule laid down in *Langston* v. *State*, 109 *Ga.* 153 (1) (35 S. E. 166) and similar cases, where the "other false or fraudulent means" are in no manner specified.

■ As to the general grounds, a consideration of the allegations contained in the several counts of the indictment is necessary in order to determine whether the evidence is sufficient to support the material allegations therein contained. Count 1 of the indictment charges that the defendant "did unlawfully give to Paul F. Bennett, a policeman of the City of Atlanta, Fulton County, Georgia, a sum of money the exact amount of which is to the grand jurors unknown, as a present and reward to influence the behavior of the said Bennett in the discharge of his official duty, said sum of money being given by the said accused to the said Bennett to influence the said Bennett to refrain from arresting the said accused and certain persons who are unknown" for

violating certain laws and ordinances pertaining, first, to lottery, second, to keeping and maintaining an ill-governed and disorderly house, and third, to certain municipal ordinances of the City of Atlanta. Count 2 charges the defendant in like manner with giving an unknown sum of money to C. E. Carter, a policeman of the City of Atlanta, for like purposes, and count 3 for giving an unknown sum of money to G. H. Wade, policeman of the City of Atlanta, for like purposes. Count 4 charges that the defendant "did unlawfully and directly use promises, threats, persuasions and other like sinister, unfair and fraudulent practices with intent and in order to obtain and influence the behavior of R. M. Clark and R. T. Appling, policemen of the City of Atlanta, Fulton County, Georgia, and to cause the said Clark and Appling to refrain from arresting the said accused and certain persons who are to the grand jurors unknown" for the same purposes set forth in the preceding counts of the indictment.

This record is silent as to whether any case has ever been made against this defendant for any of the offenses for which the bribes are alleged to have been given to prevent or the intimidation is alleged to have discouraged. It does appear that no cases were made by any of the officers alleged to have been bribed or intimidated, but in order not to prejudice the rights of the defendant in subsequent litigation, involving these crimes, it is sufficient for the purpose of a decision in this case to point out that there is ample evidence in the record as to one or more of such crimes committed by this defendant to authorize the ruling that the allegations of the indictment with reference thereto are supported by some evidence. As to the general grounds, therefore, it is necessary further to determine if the evidence authorizes an affirmative finding of the two remaining elements: first, if the money as alleged was given and if the intimidation occurred as alleged, and, second, if it was for the purpose of influencing the conduct of the police officers therein designated. The latter element is established if at all only by the inference to be drawn therefrom by proof of the two other elements, viz., the giving of the money, and the commission of one or more of the crimes, plus any evidence in the record which may tend to throw light on this issue. In that connection, Officers Clark and

Appling testified in substance that Ingram told them that "he was good to policemen, paid their various bills," etc. This element of the offense of bribery is almost impossible to prove by direct evidence since the purpose for which money may be given to a public officer must of necessity be in the mind of the giver and may ordinarily be established only by circumstances. If the money was given as alleged, or if the intimidation occurred, the jury was authorized from the evidence here to draw the inference that its purpose was to influence the officers as alleged in the various counts of the indictment. With reference to the giving of the money, there is testimony about three instances, but only two of those instances tend to support the indictment. Count 1 alleges the date of January 9, 1957, and the recipient of the money to be Paul F. Bennett. Count 2 alleges the date of March 25, 1957, and C. E. Carter as the recipient. Count 3 alleges the date of March 25, 1957, and the recipient to be G. H. Wade. The evidence discloses without dispute that C. E. Carter and G. H. Wade were at Ingram's garage on March 25, 1957, from 8:04 p.m. to 8:10 p.m., together in a Chevrolet police patrol car with the number 324 painted thereon. The evidence discloses that a Ford police patrol car was at the garage that same evening from 7:46 p.m. to 7:53 p.m., and that money was handed by the defendant into the window of that car from the driver's side. There is no evidence, however, as to who the occupants of that car were, nor that any occupant of that car was either Paul F. Bennett, C. E. Carter or G. H. Wade. The evidence on the subject of the giving of the money is, therefore, narrowed down to the question of whether it is sufficient to support the allegation of count 1 of the bill of the indictment, wherein the defendant is charged with giving a sum of money to Paul F. Bennett on January 9, while he was there after 5 p.m., for a few minutes; to count 2 wherein the defendant is charged with giving a sum of money to C. E. Carter on March 25, while he was there between 8:04 and 8:10 p.m., and to count 3 wherein it is charged that the defendant gave a sum of money to G. H. Wade, while he was there with C. E. Carter.

All the evidence as to the giving and receiving of money is by

witnesses who were concealed in a dwelling house from 50 to 60 feet from where the transactions are described as having taken place.   One of these witnesses is Jack Nelson, a reporter for the Atlanta Constitution, a daily newspaper published in Atlanta. Another such witness is George Carter, an investigator who works out of the office of the Solicitor of the Criminal Court of Fulton County.   The third such witness is an occupant of the dwelling house from the window of which these witnesses say they saw the transactions in question.   The testimony of each with reference to this subject matter is set forth somewhat in detail.

Jack Nelson (Direct examination): "I saw Mr. Ingram reach into his left front pocket with his left hand and pull out a roll of bills and pull off several bills, I thought it was 3 or 4  .  .  . and put them in the left front pocket of the patrolman.  .  . It was money Mr. Ingram placed in the patrolman's pocket.   I could not see the bills well enough to see the denominations. I have testified that they were money, currency.  .  .   The interior lights of the police car were shining.   I saw Mr. Ingram walk out to the second car just as he had done in the previous instance and reach in his left front pocket and take a roll of bills out of his pocket and peel off several bills and hand them in the police car.   I saw bills in both these transactions.   It was currency—money.   I could not tell the denominations of the bills. I cannot give you the number of bills on any of these transactions I have testified to.   I would say there were three or four bills on each occasion, each of the three occasions.

(Cross examination).   "You ask me how I know it was money I saw if I could not see the denomination.   I recognized it as being money that is all.   I don't think it could have been anything else.   I am being positive.   I recognized it as money, as a roll of money.   I didn't see anything on the money.   I just saw the roll of money.   I am swearing it was money.   I recognized it as being money.   I was looking through my binoculars, and what I saw on it to indicate that it was money was I just recognized it as money.   I just saw a roll of bills come out of Mr. Ingram's pocket.   It looked green.   I did not see anybody's picture on it.   I was not able to read any printing on it through the binoculars.   I saw Mr. Ingram standing there and reach in

his pocket like this, with his left hand, walk over here a few feet and peel off several bills, reach down and stick them in the left-hand front pocket of the patrolman who was standing there. From where I was sitting his left hand and left side would be facing me, right in front of me. He walked over and the patrolman was standing this way and he put it in with his right hand. . . It could possibly have been his left hand that he put it in with. I know that he took it out of his left front pocket and put it in the left front pocket of the patrolman. He stuck the roll back in his pocket. He passed the material I call money after he had put the roll back in his pocket. . . Mr. Ingram put the money in the window of the car. Mr. Ingram walked out through the garage doors, peeled off several bills and stuck them in the window of the police car. I was not looking through binoculars. We measured the distance I was from that particular spot, and the best I remember it was 50 maybe 60 feet. I don't think it could have been more. I recognized money the same as I did the last time. I saw it come out and it looked like money to me. I have seen money all my life. He pulled out a roll of bills and pulled off several and handed them in the police car. I recognized it as being money. What I saw was indicated that it was money it was rolled up in the same manner as before, as it had been on the 9th, and it looked like money and he peeled it off as anyone will take several bills off a roll of money and handed it through the police car. What I saw on the night of the 25th, after dark, to indicate to me that it was money that came out of Mr. Ingram's pocket was it just looked like money to me. I don't know that I saw anything besides the shape and the color of it and the way it was handled, the way it was carried and handled, the way it looked. It looked like money. I did not see the color of it on the night of the 25th. It was in Mr. Ingram's left hand. . . On the same night another car came out there. . . Mr. Ingram did exactly the same thing as he did with the other car, he reached in his pocket and pulled out a roll of bills and took off several of them, three or four, and put them in the window of the car. . . I knew it was money the same way I knew it before, it was handled like money, it was taken out of his pocket that I had seen him take

it out of before.  I am testifying that it was money by the shape and the way it was handled and the way it looked.  I did not see the color of it.  I don't recall that I saw any markings on it. I am testifying from the way it was handled and the shape of it and the fact that it came out of Mr. Ingram's pocket and it looked like money to me, that it was money.  I just told you it looked like money.  It was taken out of his pocket.  It was peeled off and handled like money and put in the patrol car. I think it was put in with his right hand.  I didn't see the color of it.  I am going by the shape of it and the way it was handled, and the way it looked.  It looked like money.  It was shaped like money.  I couldn't see the color.  You could tell it was dark.  It was not white and it handled like money.  The truth of the matter is that I saw him take the money out of his pocket and put it in the police car.  To me it looked like money beyond a reasonable doubt.  .  .  I did see the color of the money when I looked at it through binoculars.  I saw no markings on it that I could distinguish.  In addition to the color I am testifying it was money because of the size and shape and the way it was handled, which is the same thing I have my further testimony on about the other two occasions where I say money passed hands, that is, the size and shape and the way it was handled."

"Mrs. Maymie Lee: (Direct)  .  .  .  then Horace Ingram reached in his left hand front pocket and pulled out a roll of bills and he rolled off 3 or 4 and rolled them up and put them in the policeman's left hand front pocket."  (No cross-examination).

George Carter: (Direct) "The car drove into the garage lot and stopped and turned its lights off, and Mr. Horace Ingram came out and approached the car and as he did so he was looking around and he reached into his left side pants pocket and pulled out a roll of bills and he peeled off several bills from the roll and dropped it into the car on the driver's side.  The car came in at 7:46 and left at 7:53.  .  .  Later  .  .  .  a Chevrolet drove in.  .  .  After he approached it, Mr. Ingram looked around again and reached into his left pocket and pulled out a roll of bills, from which he peeled several bills, put the money back into his pocket.  I could not see what he did with the bills

he peeled off for at that moment Mr. Jack Nelson gave me a shove. . .

(Cross-examination) "The lights were not on inside that car. The headlights were turned off. . . Mr. Ingram was directly by the left front window on the driver's side facing us. I say he put his hand in his pocket and brought out some money. I was not able to see the color of what he had in his hand. I was not able to see any markings on what he had in his hand, or any letters, printing, word or etchings. As to the size of what he had in his hand, it looked like a roll, just about filled up his hand. I could not estimate the size of the roll, but you could tell it was a roll of money. The way I could tell if I couldn't see it was from the way he held it, the manner in which he pulled it out of his pocket and held it and peeled off several bills, I don't know how many, I couldn't say, putting the money back into his left side pocket and dropping this over into the car, and that is what I am basing my testimony on in regard to it being money. The fact that it filled his hand and the manner in which it was handled. On that particular occasion I testified I saw him take money out of his pocket. I am basing that testimony on the fact that he took it out with his left hand and the shape and size of it and it handled like money; peeling off bills. . . I said it was money because of the shape and size and the way it was handled. I did not see any color. I did not see any marking, etching, printing, number, numerals, pictures. I am basing my testimony on the fact that it came out of Mr. Ingram's pocket and he held it in his hands and he handled it like money."

An examination of this testimony discloses that while two of the witnesses, Nelson and Carter, testified on direct examination positively that it was "money" which was handled by the defendant on each of these occasions, their cross-examination discloses that the positive testimony that it was money is a conclusion drawn by the witnesses based on certain various facts which sustain this conclusion and therefore is circumstantial evidence. The third witness, Mrs. Lee, testified only that it was a "roll of bills" which is no more than a circumstance that it was money. The sufficiency of this evidence as to counts 1 and 2 has given this court serious concern as to whether it meets

the circumstantial evidence rule and supports the allegation in the indictment that this was money. Recognizing that this fact may be proved by circumstantial evidence, provided it is sufficient to establish the fact to the exclusion of every other reasonable hypothesis, we have concluded that the jury was authorized to find from this evidence that what was handed by Ingram to the policemen was money, although we recognize the extreme closeness of the case on this question. While any one of numerous objects could have been handled by the defendant on the occasions in question, all the facts and circumstances surrounding the transactions point to the fact that it was money, and the jury, believing the testimony of these witnesses, could have come to no other reasonable conclusion. Even where an issue in a case depends upon circumstantial evidence, the guilt of the defendant need not be shown to a mathematical certainty; nor need every bare possibility, no matter how far-fetched, and every possible doubt no matter how fanciful, be eliminated by absolute proof of the contrary, but in all criminal cases, whether resting on direct or circumstantial evidence "the doubts of a jury, to justify an acquittal, should be reasonable, and not a mere vague conjecture or possibility of the innocence of the accused." *Giles* v. *State*, 6 *Ga.* 276(6). What the law requires is proof of guilt to a reasonable and moral certainty. *McNaughton* v. *State,* 136 *Ga.* 600, 612 (71 S. E. 1038).

Since the money alleged in counts 2 and 3 of the indictment to have been given to Carter and Wade respectively, is shown by the evidence without dispute to be the same money, and since the only evidence with reference to it shows that it was handed through the window of the car on the driver's side, and since Carter and not Wade was driving, there is no evidence that any money was given to Wade and no evidence that Wade had any knowledge of any money being given to Carter. Accordingly, count 3 of the indictment is without evidence to support it and the trial court erred in denying the motion for new trial as to this count on the general grounds.

In regard to count 4, Code (Ann.) § 26-4102 provides in part that "if any person shall . . . use any promises, threats, persuasions, or other like sinister, unfair, or fraudulent practices in order to obtain or influence the opinion, judgment, decree, or

behavior of any . . . officer of this State . . . in any matter or cause pending, or which shall pend before him, such person . . . shall be guilty of a felony." As set forth above, this count of the indictment contained the language allegedly used by the defendant to officers Clark and Appling which was relied upon as constituting such threats, persuasions and like practices. Clark testified that he was a former member of the Atlanta police force; that he and his partner, Appling, had given a ticket for speeding to a person whom they later discovered to be the defendant's son; that in response to a call they went to a filling station and that Ingram came up to talk to them, that he told them he was good to the police, sent them on vacation and bought their groceries and paid their doctor bills; that he discussed certain activities of employees of his in the lottery business and told Clark he was having trouble because Clark had scared off some of his men from making collections in certain sections; that he accused the officers of giving a traffic ticket to his son just to pick on him, and he then said: "I have got more power and more politics than either one of you and I am going to have you moved off this beat. I am going to bet you a thousand dollars I am going to have you moved off this beat." He tossed a roll of bills, on top of which was a $100 bill, on the top of the car. Clark testified that this conversation did have the effect of worrying and intimidating him; that he repeated it to his immediate superior later on in the day and the police captain told him not to worry, that he was doing a good job and would not be transferred off the beat; that nevertheless he was transferred from that beat to a walking beat. His partner, Appling testified to substantially the same conversation. There is also testimony that there were a number of transfers at the same time which were the result of general police procedure and the transfer of the witnesses was included in this reorganization and could have had nothing to do with the defendant's threats. Regardless of this, the jury were authorized to find from the State's evidence that the threats were made by the defendant in the course of an argument between him and the police officers, and had reference to matters which would be pending before them, future arrests of certain of the defendant's employees in the lottery business, and that they were made with the intention

of influencing the behavior of the officers as to these matters. The evidence was accordingly sufficient, on the general grounds, as to count 4.

■ Special ground 2 of the amended motion for new trial assigns error on the denial of defendant's motion for a mistrial based upon improper statements of the solicitor in his argument tending to discredit Little, a witness characterized by both sides as "one of the principal witnesses for the defendant." Special grounds 8, 9 and 10 complain of the denial of a motion for mistrial based upon certain leading questions on the part of the solicitor to a witness for the State, answers of the witness, and comments of the court, which, it is contended, injected into the trial irrelevant and prejudicial matter calculated to stir up racial prejudice.

■ As to ground 2, it has been seen that the testimony of R. M. Clark, a former police officer and witness for the State, was relied upon and had the effect of directly proving every material allegation of count 4 of the indictment as well as having great weight in substantiating the first two counts by showing statements of the defendant from which it might reasonably be inferred that he was in the habit of making large payments to members of the police force. To counter this testimony the defense called R. E. Little, another member of the Atlanta police department, who testified that he knew Clark's reputation from an investigation he had conducted regarding him, that his reputation was bad and that he would not believe him on oath. The solicitor in his argument to the jury stated: "When Lieutenant Little, one of the principal witnesses for the defendant, left the stand, he said to me that he wasn't biased and I said to Lieutenant Little, 'I think you were biased.'" Counsel for the defendant immediately moved for a mistrial. The court then stated: "I will overrule the motion for a mistrial. Gentlemen of the jury, I will instruct you not to consider that statement made by the solicitor in your deliberations of this case. Just dismiss it from your mind entirely in your considerations."

Code § 81-1009 provides: "Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same; and, on objection made, he shall also rebuke the coun-

sel, and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the plaintiff's attorney is the offender." In applying this Code section to the facts set forth in special ground 2 of the amended motion for a new trial, for the purpose of determining whether the trial court erred in failing to take any action on objection made other than to instruct the jury to disregard the remark, it is particularly important to consider the circumstances for the reason that it relates directly to the proposition of whether or not the defendant has had a fair trial; if the remark or statement is not such as would be likely to prejudice his rights in this regard the error will not be reversible although this court may feel that the trial court should have resorted to stronger corrective measures. We are dealing with the testimony of a man characterized by both the State and the defendant as one of the most important witnesses for the defendant. The reason behind the importance of his testimony is that it relates to the impeachment of one of the most important witnesses for the State. In considering the probable prejudicial effect of the solicitor's statement to the jury of a fact not in evidence (that the defendant's witness felt it necessary to reassure the solicitor of his state of mind, and that the solicitor in effect replied that he did not believe him) note will be taken at this point of another assignment of error upon which it will not be necessary to pass directly; that is, the denial of the defendant's motion for change of venue based on the proposition that he could not get a fair trial in Fulton County because of the tremendous amount of adverse newspaper publicity which preceded his trial. Numerous exhibits and affidavits were attached, as to which this court only makes the observation that it exceeds in volume that of any like case to which our attention has been called. Among the exhibits constituting photostatic copies of newspaper articles are contained the following: "MILLION DOLLAR BUG RAID AT N'SIDE GARAGE NETS 7. . . In Horace Ingram's wallet, Kelley said, was a card containing the telephone numbers of an Atlanta police captain and seven Atlanta detectives. . . "JENKINS ASKS PROBE OF BUG PROTECTION . . . Mr. Kelley said Horace Ingram was the individual named by an Atlanta police officer three

months ago as being the man who had him transferred from one beat to another for arresting too many lottery car drivers. . . LOTTERY RAID STIRS QUERIES. . . Some time ago an Atlanta police officer claimed he was transferred because of the influence of a big-time lottery operator. A grand jury investigated but found no basis for the claim. On the person of one of those arrested Wednesday night, officers reportedly found a card containing the telephone numbers of an Atlanta police captain and seven Atlanta detectives. . . FULTON GRAND JURY TO HEAR REPORT OF POLICE BUG SHIELD. . . Solicitor General Webb said Thursday, 'Certainly if there is any evidence of lottery protection I will investigate.' . . . PO-LICE MADE 15 VISITS IN 11 DAYS TO INGRAM'S. . . Solicitor Kelley said Ingram is the man who was accused last December of trying to have a policeman moved off a beat because the policeman was stopping cars driven by men who worked for Ingram. The policeman, Ronnie Clark, swore that he was transferred two days after Ingram told him he would be moved. Chief Jenkins at first said Clark's transfer was merely 'routine' but the following day Jenkins said the officer was transferred because of complaints from people who received traffic tickets from Clark. Jenkins said Clark was an 'eager beaver' who let authority go to his head. A Fulton grand jury subsequently investigated Clark's charge and reported 'any transfer or changes were merely coincidental with the charges made.' Clark later resigned from the police force. . . LET'S GET THE TRUTH ON LOTTERY SCANDAL. . . But it becomes much more meaningful in the light of testimony several months ago by a now-resigned policeman that he was transferred from his beat for traffic arrests of known lottery operators or figures. . . GRAND JURY OPENS STUDY OF BUG RAID. . . He also said his committee would be interested in reopening the case of the policeman who said he was transferred from his beat at the behest of an alleged lottery operator, if evidence of protection was forthcoming. . . BUG PROBE NAMES KEPT UNDER WRAPS. Webb Silent On Advice From a Judge But Says Ex-policeman on Witness list. . . He did say, in answer to questions, however, that the list of possible witnesses will include former Atlanta policemen R. M. Clark

and R. A. Boone. Mr. Clark is the officer who left the force after charging that lottery men got him transferred off his north-west Atlanta beat. . . A GHOST IS RAISED . . . Most interesting witness of the entire investigation should be R. M. Clark, until fairly recently a member of the Atlanta Police Department. Last winter Mr. Clark charged that lottery operators had him transferred from his beat because he was interfering with the operations currently under grand jury scrutiny. The December jury investigated Mr. Clark's charges and reported 'we have found no evidence that Officer Clark's change in assignment was caused by the influence of any person or persons alleged or suspected of being engaged in any unlawful business.' Mr. Clark left the force and there the matter rested until the raid reopened the question of protected rackets in Atlanta and forced a re-examination of this ex-policeman's earlier charges. . . . LOTTERY PROBERS EXPECTED TO HEAR EX-OFFICER HERE. Former Atlanta policeman Ronnie Clark is expected to go before the Fulton County Grand Jury in connection with the jury's investigation of what Federal agents have called a 'protected' multimillion-dollar lottery. It was learned that Carter Goode, a lawyer of Solicitor General Paul Webb's staff assigned to the investigation contacted Clark Monday. Clark is the policeman who . . .", etc.

On the trial of the motion for change of venue all of the 48 prospective jurors from whom the jury trying the case was chosen were questioned, and of them 44 were familiar with the defendant through newspaper coverage, and 15 indicated that they did or might have some bias against the accused. Accordingly on the issue of Ingram's guilt or innocence, especially as it might be affected by the credence which the jury placed in the testimony of R. M. Clark, the situation is shown to have been such that, to insure a fair and impartial trial, it was of particular importance that the jury not be swayed by anything outside the evidence in the case, and most importantly that it not be in position to receive *during the trial* matters not in evidence which would be likely to relate back to other matters, also not in evidence, brought to their attention before the trial of the case. One of the main issues made in the series of newspaper articles (which spread over a period of months) was whether Clark was

telling the truth about matters which he claimed led to his resignation from the police force. Clark gave the same testimony upon the stand. The defense resorted to what was practically its only weapon to nullify this testimony—impeachment by other police officers of Clark's testimony on the ground that he had a bad reputation for veracity. Whether such defense could be successful depended on the amount of credence the jury was willing to give the defense witnesses on this point. The respect jurors ordinarily have for solicitors-general is such that it cannot be said that this improper statement could have had no adverse effect upon the defendant. "If there were anything in the evidence showing improper bias on the part of any of the witnesses in favor of one party, or prejudice against the opposite party, this was a circumstance which affected their credibility and detracted from the force and weight of their testimony, of which the jury were the exclusive judges." *Cincinnati & Georgia R. v. Nettles*, 77 *Ga.* 576(1). The solicitor, as well as the witness Clark, had received tremendous publicity in connection with the case, the latter in regard to the subject matter of his testimony, and the former in regard to his personal investigation of the case prior to trial. Much of this was necessarily known to the jury, the members of whom acknowledged their familiarity with the newspaper coverage of the investigation. To convict Ingram, it was necessary for them to assess the credibility of Clark which was directly assailed by Little. At this point the solicitor injected into the case facts not in evidence from which they might infer that Little himself was so harrassed and uncertain that it was necessary for him to assure the solicitor of his lack of bias (the one thing which would destroy the credibility of his testimony), and counsel informed the jury of this fact, and that he personally believed he was biased, and that he told him so.

In *Heard* v. *State*, 210 *Ga.* 108 (78 S. E. 2d 38) where the solicitor-general in argument stated a witness had informed him that "this murder was so brutal . . . that he never expected so long as he practiced law to represent another person charged with murder" it was held reversible error merely to rule that the solicitor should stay within the evidence, and to fail to rebuke him and endeavor to remove the impression from the minds of the jury. In *Loomis* v. *State*, 78 *Ga. App.* 153, 183

(51 S. E. 2d 13) where the solicitor stated, "If you fail to bring a verdict of guilty, I shall feel terribly disappointed," and the court took no corrective measures, it was held reversible error, the court quoting from *Moore v. State,* 10 *Ga. App.* 805, 811 (74 S. E. 315) as follows: "If the statement is an expression of the personal opinion of the prosecuting attorney in a criminal case that the defendant is guilty, this is error, and it must be presumed to be prejudicial error, because cases can be imagined where counsel might be engaged for the prosecution whose personal opinion would have such weight with the jury as to unduly affect their finding upon the facts." In *Woodard v. State,* 91 *Ga. App.* 374 (5) (85 S. E. 2d 723), where the solicitor made no effort to impeach a witness but, after the evidence closed, stated to the court that he had a dozen witnesses that he wished to put on the stand to impeach the witness, it was held error to deny the motion for a mistrial or fail to take other corrective measures. In *Josey v. State,* 89 *Ga. App.* 215, 220 (79 S. E. 2d 64) it is pointed out that the provision of Code § 81-1009 that the court *"shall* also rebuke counsel, and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds" is mandatory. See also to the same effect *Ralls v. State,* 87 *Ga. App.* 655 (1) (75 S. E. 2d 26); *Broznack v. State,* 109 *Ga.* 514, 516 (35 S. E. 123); *Georgia Power Co. v. Puckett,* 181 *Ga.* 386 (182 S. E. 384); *Jones v. State,* 123 *Ga.* 129, 131 (51 S. E. 312); *Barfield v. State,* 179 *Ga.* 293 (175 S. E. 582); *Mitchum v. State,* 11 *Ga.* 615; *Washington v. State,* 80 *Ga. App.* 415 (56 S. E. 2d 119); *Smoot v. State,* 146 *Ga.* 76 (90 S. E. 715).

■ As to grounds 8, 9 and 10, the following occurred on direct examination of Mrs. Maymie Lee, a witness for the State: "Q. Now have you seen anybody actually drinking anything out there? A. Yes, I have. Q. What have you seen anybody drinking? A. Well, I have seen them pass the liquor bottle around. Q. Seen who pass the liquor bottle around? A. The men, Horace Ingram, and all of them down there at the garage. Q. By all of them, I will ask you whether you mean all of them down there, Rufus Jenkins, Horace, all of them? A. Yes, sir. Q. You mean just pass the bottle back and forth? A. Yes. Q. White folks and colored both? A. Yes, sir.

Q. And all of them drink out of the same bottle? A. Yes, sir."

On objection made and motion for a mistrial on the ground that the solicitor, in the form of questions, was making remarks of an irrelevant, inadmissible, inflammatory and prejudicial nature, and that the answers were objectionable for the same reason, the court stated, "I don't consider that a derogatory remark."

While, on the issue of whether the defendant kept a disorderly house, evidence that drinking was going on was admissible, whether prejudicial or not, it is perfectly obvious that whether or not members of the white and colored races drank out of the same bottle had no relevancy. It is also obvious that the form of the questions as herein set out sought to point up the testimony that mixed drinking was habitually practiced at the defendant's garage. The court held that such evidence was not derogatory to the defendant, and, while this may well be true in an abstract sense, we are of the opinion that as a practical matter it was exactly the sort of inadmissible evidence which would be most likely to incline a jury against him. The court, and every citizen of this State, is well aware that at the present moment Georgia is one of a minority of States which adheres to the position that mixing of the races is not desirable, and that the issue of racial integration is fraught with great emotional tension in the face of Brown v. Board of Education of Topeka, 349 U. S. 294 (75 Sup. Ct. 753, 99 L. ed. 1083), and other cases seeking to force racial integration in schools and other public and quasi-public places. In this State it is common knowledge that the accepted way of life for both races includes separate restaurants, separate drinking fountains in public places, and separate facilities for eating and drinking generally. Accordingly it cannot be said with any assurance that testimony that members of the white and colored race drank out of the same whisky bottle would not have a prejudicial effect. Obviously counsel for the State sought that effect by the nature of the questions asked, in order to stress the fact that the defendant drank out of the same whisky bottle with members of the colored race. The effect of such testimony could not be eradicated by the court's statement, "I do not consider that a derogatory remark." The Federal courts have been very zealous in guarding members of the mi-

nority races against the introduction of testimony of this nature, and are quick to hold that mention of racial differences is prejudicial to the defendant's right to a fair trial. See Fontanello v. U. S., 19 Fed. 2d 921; U. S. v. Remington, 191 Fed. 2d 246, cert. den., 343 U. S. 907 (72 Sup. Ct. 580, 96 L. ed. 1325); Ross v. U. S., 180 Fed. 2d 160. Courts of this State have also been careful to protect members of the black race against such prejudice. See Cofield v. State, 14 Ga. App. 813 (82 S. E. 355); Thompson v. State, 27 Ga. App. 637 (109 S. E. 516). The purpose of the laws of this country, both State and Federal, is to afford equal protection to all. Accordingly, this defendant, a white man, is also entitled to that protection. As long as it exists in this State, our courts must continue to recognize that racial prejudice has no place in the administration of justice.

Any error committed upon the trial is more likely to have been prejudicial in this case, due to the closeness of the evidence and to the great volume of publicity given the case prior to the trial than would be true in a case not involving these factors. Fitzgerald v. State, 184 Ga. 19 (190 S. E. 602). The trial court erred in denying the motion for new trial as to grounds 4, 8, 9 and 10.

■ Special grounds 4, 5 and 6 of the amended motion for a new trial complain of the refusal to give requested charges relating to the first 3 counts of the indictment, a part of each of the requests being as follows: "If you find that the State has failed to prove beyond a reasonable doubt that [the named policeman] knew that Horace Ingram was violating the lottery laws of Georgia, and violating the law of Georgia relating to disorderly houses as defined in the indictment, and violating the ordinances of the City of Atlanta as set out in the indictment, you would stop right there in your deliberations and find a verdict of not guilty." The indictments charged that these violations of law were known to the police officers; accordingly, if, by reason of the allegation, this fact became material to be proved, the refusal of the request was error. If, on the contrary, it was immaterial, the request was properly denied. Mandel v. Fulcher, 86 Ga. 166 (4) (12 S. E. 469). "An allegation in an indictment that is wholly unnecessary to constitute the offense charged is mere

surplusage." *Wood* v. *State,* 69 *Ga. App.* 450 (26 S. E. 2d 140). An immaterial description of a material fact must be proved as alleged, but an immaterial description of an immaterial fact need not be proved. *Hall* v. *State,* 120 *Ga.* 142, 144 (47 S. E. 519). "It would seem unnecessary that the person delivering the reward should actually and consciously have had in mind that he was paying for official services, but upon this point it would be sufficient if the defendant himself knew and intended that in accomplishing the desired end he would in fact perform official services of some character as a part of the entire object to be achieved. It has been held that if a person delivers money to a public officer with the corrupt intention of influencing his decision in a matter pending before him, such person is guilty of bribery, although the officer receives the money in ignorance of what it is." *Taylor* v. *State,* 44 *Ga. App.* 387, 409 (161 S. E. 793). In that case the defendant was indicted for receiving a bribe, and the indictment alleged that the purpose of the *payment* of the bribe (as well as of receiving it) was to influence the defendant to do certain acts in his official capacity, but there was no direct evidence as to whether the giver of the bribe understood or considered whether the acts were to be done in an official capacity or otherwise. In 11 C.J.S. 845, Bribery, § 2, it is stated: "A person may be guilty of bribing a public officer, although the officer had no corrupt purpose or intent, the guilt of the briber being measured by his own intent and not by the intent of the acceptor of the bribe." The duty of a police officer is to investigate and arrest for offenses that are known to him; whether or not the knowledge has raised a duty as to him does not affect the intent of the one who seeks, successfully or otherwise, to influence him. Accordingly, the allegations that the police officers knew of the violations of law at the time the bribes were given is no part of the offense charged and must be treated as surplusage, for which reason a request to charge that unless this fact had been proved the defendant must be acquitted was properly refused. Special grounds 4, 5 and 6 are accordingly without merit.

■ Although it is not proper to read or comment on facts from previously adjudicated cases (Code, Ann., § 24-3319; *Huckabee*

v. *Grace,* 48 *Ga. App.* 621, 634, 173 S. E. 744), any error in allowing the solicitor to read to the court in the presence of the jury from an appellate decision, and then to state, "This case holds that if lottery tickets were found in possession of the defendant that he would be guilty of lottery" is not reversible where the court correctly charged: "Mere possession of a lottery ticket is not, of itself, evidence that the person in possession of the ticket is engaged in the business known as lottery. Mere evidence that a person found in possession of lottery tickets may be in the company of one engaged in the business of lottery does not conclusively show that person himself to be in the business of lottery." See *McMath* v. *State,* 55 *Ga.* 303 (8). In so far as this ground complains that the solicitor should not have read the *facts* of an adjudicated case, the ground does not set out the facts read nor the decision from which they were taken, and accordingly this court cannot tell whether such facts would in any way be prejudicial in this case. In so far as it complains of the solicitor's remark, which does not set forth facts but an erroneous conclusion of law, this was corrected by the court in his charge.

■ Special ground 3 complains that the solicitor in his argument referred to the defendant as a "nefarious character." Similar characterizations have frequently been allowed by the appellate courts as permissible argument when the same is treated as a deduction or inference from evidence. *Hyde* v. *State,* 196 *Ga.* 475 (7) (26 S. E. 2d 744); *Fann* v. *State,* 195 *Ga.* 176 (6) (23 S. E. 2d 399). The rule is that counsel may argue his inferences and conclusions from the evidence, though they may be far-fetched or ill founded or flights of fancy; what he may not do is to inject by way of argument facts not in evidence. It is better practice for counsel, when he seeks to characterize the defendant in a criminal case by any of the words which may suggest the conclusion that he is an undesirable member of the community, to do so cautiously and then only as the evidence in the case may be pointed out by him as leading to this conclusion, for it is sometimes difficult, unless the proposition be clearly put, for an appellate court to distinguish between those characterizations which are drawn from evidence and those which are mere opinions of the speaker.

The assignment of error on the judgment of the trial court denying the motion for a change of venue has become moot in as much as this case is being reversed on other grounds.

The trial court did not err in overruling the demurrers to the indictment but erred in denying the motion for new trial on the general grounds as to count 3 of the indictment as pointed out in division 2 hereof, and erred in denying the motion for new trial as to all counts for the reasons stated in division 3 of this opinion.

*Judgment reversed. Gardner, P.J., and Carlisle, J., concur.*